NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0787n.06
Filed: September 8, 2005

No. 04-3729

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| DOUGLAS JONES, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | ON PETITION FOR REVIEW FROM |
| v. | ) | THE UNITED STATES DEPARTMENT |
| | ) | OF LABOR |
| UNITED STATES DEPARTMENT OF | ) | |
| LABOR, ADMINISTRATIVE REVIEW | ) | |
| BOARD; UNITED STATES | ) | |
| ENRICHMENT CORPORATION, | ) | |
| | ) | |
| Respondents. | | |

Before:  ROGERS and SUTTON, Circuit Judges; ROSEN, District Judge.[*]

SUTTON, Circuit Judge.  Douglas Jones seeks review of a decision by the United States Department of Labor's Administrative Review Board, holding that he failed to prove that his employer, the United States Enrichment Corporation ("the company"), retaliated against him in violation of the employee-protection provisions of the Energy Reorganization Act, 42 U.S.C. § 5851.  As substantial evidence supports the Board's determination, we deny the petition.

---

[*] The Honorable Gerald E. Rosen, United States District Judge for the Eastern District of Michigan, sitting by designation.

I.

Jones worked at the company's gaseous diffusion plant in Paducah, Kentucky, from June of 1988 until his discharge as part of a reduction in force (RIF) on July 5, 2000. Jones first worked at the plant as an industrial hygiene technician and later moved into the environmental compliance department. In early 1995, he became the manager of the support services department, and in 1998 he transferred to the independent assessments department. In April 1999, he transferred again, this time to the training department. His subsequent discharge from this position as part of a RIF in 2000 lies at the heart of this dispute.

As a condition of his 1999 transfer into the training department, Jones agreed to accept responsibility for the Mobile Industrial Equipment (MIE) training program. He also agreed to an annual performance plan, which included the on-time completion of at least ninety percent of his "[t]raining enhancement" assignments and the assumption of responsibility for "[r]evis[ing] [t]raining modules, as needed, to comply with rules/regulations." JA 55. Jones' training program duties included developing training modules for heavy equipment used at the plant.

One of Jones' projects in the MIE training program involved a regulation promulgated by the Occupational Safety and Health Administration, set to take effect in December 1999, that threatened to render the training program for powered industrial trucks non-compliant. In the face of this development, Jones filed a problem report on May 13, 1998, "to ensure a tracking mechanism exist[ed] which w[ould] include evaluation of the newly promulgated training requirements and

revision of the mobile industrial equipment training module(s) . . . prior to the [OSHA] compliance date of 12/01/99." JA 388. Problem reports are part of the company's plant-wide procedure for documenting issues—including non-compliance with safety regulations—and ensuring that they are resolved. From May 13, 1999, to March 23, 2000, Jones filed thirteen problem reports relating to deficiencies in training records, instructional materials and vehicle-operating licenses at the company.

Jones did not develop the powered-industrial-truck training module in time to meet the December 1999 OSHA compliance deadline. (He eventually completed the project on April 5, 2000.) On January 10, 2000, Jones submitted a written request to management seeking a transfer from the MIE training program to environmental training. In his request he acknowledged: "When I accepted [this] assignment, I did not foresee the various obstacles that" would arise and "[h]aving me as the [t]raining representative for mobile industrial equipment [ ] makes [the] [t]raining [department] appear weak because of my lack of experience in this area." JA 60. He also confessed that his lack of experience in the field had led to difficulty in "communicating the problems [he] perceive[d] in the program with management" and that there were "probably other personnel who would do a much better job . . . in this area." *Id.* The manager of the training department, Russ Starkey, denied Jones' transfer request and instead moved Ed Craven, an experienced trainer and problem solver, into the MIE program. Starkey also replaced Ron Fowler as the supervisor of the training program, assigning Danny Bucy to supervise Jones and Craven.

In Jones' self-assessment, dated January 12, 2000, he admitted responsibility for the training areas assigned to him and acknowledged that "due to lack of training and expertise, [I] have not implemented all the changes needed, yet." JA 61. Shortly thereafter, on February 7, 2000, Jones received his mid-year evaluation from his former supervisor, Ron Fowler, in which Jones received a "meets expectation" rating in four categories and a "below goals/expectations" rating in the category relating to job knowledge, initiative and interpersonal skills. Jones protested the evaluation, after which the human resources department looked into the matter and concluded that the assessment was justified.

In February 2000, the company announced a RIF. Starkey and his four group managers agreed that it was necessary to reduce the employees in the production training division from two to one, meaning that either Craven or Jones would lose his job. Starkey, Bucy and Fowler independently rated Jones and Craven according to a list of job ratings. Jones scored considerably lower than Craven on the assessment, and the company discharged him on July 5, 2000.

On December 21, 2000, Jones filed a complaint with OSHA alleging retaliation in violation of § 211 of the Energy Reorganization Act. After an investigation, OSHA concluded that Jones' claim was without merit, noting that "the circumstances surrounding [Jones'] allegation of discrimination in violation of Section 211 of the ERA do not [compel an inference of] retaliation due to activity protected by this Act." Letter from Karen L. Mann, Deputy Regional Administrator, Department of Labor, to Doug Jones of April 18, 2001. Jones then sought and received a formal hearing before an administrative law judge (ALJ), who concluded that the company discharged

Jones at least in part in retaliation for reporting safety concerns. The company appealed this decision to

the Board, which reversed the ALJ's decision after determining that Jones had not established by a preponderance of the evidence that retaliation was a contributing factor in his discharge. Board at 16.

## II.

To prevail on his claim, Jones has the burden of proving by a preponderance of the evidence that (1) he engaged in protected activity, (2) he suffered an adverse employment action and (3) the protected activity was a contributing factor in the adverse employment action. 42 U.S.C. § 5851(b)(3)(C); *Dysert v. United States Sec'y of Labor*, 105 F.3d 607, 609–10 (11th Cir. 1997). If he meets this burden, the company may avoid liability by proving "by clear and convincing evidence that it would have taken the same unfavorable personnel action in the absence of [the protected] behavior." *Trimmer v. U.S. Dep't of Labor*, 174 F.3d 1098, 1101 (10th Cir. 1999); *see* 42 U.S.C. § 5851(b)(3)(D).

We review the Board's decision under the Administrative Procedure Act, 42 U.S.C. § 5851(c)(1) ("Review shall conform to chapter 7 of Title 5."), which means that we must uphold the Board's order and findings as long as they are not "arbitrary, capricious, an abuse of discretion, [ ] otherwise not in accordance with law," or "unsupported by substantial evidence." 5 U.S.C. § 706; *see Bartlik v. U.S. Dep't of Labor*, 73 F.3d 100, 102 (6th Cir. 1996).

Jones begins by arguing that the Board improperly failed to defer to the ALJ's witness credibility determinations and that this lack of deference by itself requires a reversal. We disagree.

Although a reviewing agency "is free to find facts and [ ] draw inferences different from those of the [ALJ]," *Litton Microwave Cooking Prods. Div. v. NLRB*, 868 F.2d 854, 857 (6th Cir. 1989), a reviewing court "must examine the evidence more carefully" when there is a conflict between the ALJ's and the agency's conclusions, *W.F. Bolin Co. v. NLRB*, 70 F.3d 863, 871 (6th Cir. 1995). "The significance, on review, of an [ALJ's] decision largely depends on the importance of witness credibility in the particular case," *Litton*, 868 F.2d at 857, and the issue for the court is "whether the [Review Board's] findings, and not those of the [ALJ], are supported by substantial evidence." *Mullen v. Bowen*, 800 F.2d 535, 546 (6th Cir. 1986).

In the present case, the ALJ's evaluation of Starkey and Jones, the only two witnesses to testify, does not mandate broad deference to all of the ALJ's findings. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 496–97 (1951) (noting that "[t]he significance of [the ALJ's] report, of course, depends largely on the importance of credibility in the particular case" and recognizing that an ALJ's "findings [need not] be given more weight than in reason and in the light of judicial experience they deserve"); *Litton*, 868 F.2d at 857. And that is particularly so here because the case does not turn on witness credibility alone, *see Bolin*, 70 F.3d at 872–73, and because the ALJ's credibility rulings do not purport to address all of the witnesses' testimony or dispose of all of the issues in the case, *see, e.g.*, ALJ at 9–11, 13–14, 24.

The present case concerns allegations of retaliation arising from inferences drawn from the timing and context of a series of events: Craven's transfer into the MIE program, Jones' negative evaluations, management's alleged shunning of Jones and failure to assist him in completing the training modules, and Jones' discharge. The resolution of the claim, as a result, involves more than crediting one witness over another. It also requires the evaluation of deposition testimony and a substantial record of documentary evidence, both of which the ALJ considered in reaching a decision in this case and both of which the Board could second guess without credibility-based constraints.

Nor does our decision in *Litton* alter this conclusion. There, the agency's decision contradicted the express terms of a management-rights clause in a collective bargaining agreement and rested, at least in part, on testimony by a witness *expressly discredited* by the ALJ. *Litton*, 868 F.2d at 857–58. The ALJ in *Litton* made general conclusions that one witness was "precise, unequivocal and unambiguous" while the other was "evasive and clearly bent on making his case." *Id.* Jones claims that the same is true here, Jones Reply Br. at 12, but the cited portion of the ALJ's decision does not make such a sweeping assessment, *see* ALJ at 47 ("[It] is my opinion that . . . [Jones] was[] hurt, disappointed, [and] devastated. . . . I have observed his forthrightness, his consistency, and demeanor throughout the trial, and I credit his testimony *on these points*.") (emphasis added) (quotation omitted). Because witness credibility did not play a decisive role in this case, the Board acted well within its authority in drawing its own conclusions based on its independent review of the evidence.

Jones next argues that the Board erred by applying the *McDonnell Douglas* burden-shifting framework to his claim. *Compare* 42 U.S.C. § 5851 *with McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). In one sense, Jones is correct: The Energy Reorganization Act has its own burden-shifting standard for claims of this sort. *See* 42 U.S.C. § 5851; *Trimmer*, 174 F.3d at 1101 ("In 1992 Congress amended § 5851 of the ERA to include a burden-shifting framework distinct from the Title VII employment-discrimination burden-shifting framework first established by *McDonnell Douglas Corp. v. Green*."). But the Board's mere reference to a "pretext analysis" in discussing Jones' claim does not make the decision arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law. Jones has not shown that a "pretext analysis" adversely affected his case or precisely how the use of pretext is incompatible with the burden-shifting standard for these types of claims. Substantial evidence, at any rate, supports the Board's ultimate conclusion that Jones failed to establish by a preponderance of the evidence that retaliation contributed to his discharge, making this alleged error at most a harmless one.

Jones next attempts to forestall this conclusion by pointing to five episodes that, in his view, demonstrate that retaliation was behind the discharge. *First*, Jones points to management's failure to assist him in developing a training module, which allegedly caused him to fail to meet a deadline for developing the module. The Board concluded that management did not "ignore [Jones'] requests for help" but assisted him and "wanted him to demonstrate initiative . . . , develop action plans and propose solutions, not make excuses for his inaction." Board at 9.

Substantial evidence supports this conclusion. Jones entered the training department at his own request and with the understanding that he would acquire on-the-job training. As Jones acknowledged in his testimony before the ALJ, moreover, when he eventually took the "training the trainer" course he complained about not receiving, it involved information that had been "readily available" to him all along. JA 598–99. He also admitted that he never requested special training in how to develop certain training modules and that at any time he could have interviewed the "people who actually operate the equipment [used at the company] for input and guidance" in developing these training modules. JA 600. Finally, he admitted that other employees, *e.g.*, JA 601–03 (Diane Snow), including members of the training department, *e.g.*, JA 519–20 (Donnie Gregory), were willing to assist him in performing his job.

The positive feedback that Jones received also demonstrates that management sought to assist rather than stymie his efforts to finish his assignments. Jones admitted in his testimony that he was "encouraged" to submit problem reports and that he was never criticized for filing a problem report. JA 588. Fowler told him: "I appreciate the aggressive nature [you're] demonstrating [in] finding and identifying these [safety] issues . . . . Good work." JA 607. And following Jones' discovery of another safety issue, Fowler told him to "keep on looking." JA 531. Starkey directed Jones to fill out a problem report regarding the training compliance of powered industrial trucks with the new OSHA guideline, so as to "get it on a schedule and get it resolved, corrected." JA 615. Starkey also offered encouragement at various times, noting: "you're doing a good job discovering

these problems," JA 527, "your reasoning appears sound to me . . . . Go for it," JA 58, and "[t]his all seems to make sense to me. . . . Good job." JA 529.

Jones responds by pointing to the ALJ's finding that the readily available training materials did not provide "timely or meaningful assistance to Jones." ALJ at 8. This response, however, does not account for the other evidence supporting the Board's conclusion. Nor does it account for the equally realistic possibility that the Board simply disagreed with the ALJ on this point. *See Litton*, 868 F.2d at 857; *Mullen*, 800 F.2d at 546.

Jones also points to the ALJ's conclusion that some of Starkey's encouragement was "inane" and that one of his "encouraging" e-mails was "a somewhat sarcastic, and less than serious, reply" to Jones' request for help. ALJ at 10. But Starkey offered encouragement on other occasions, as did Fowler, and the ALJ's conclusion with respect to two instances involving Starkey, based only on testimony from Starkey and Jones, does not support the sweeping conclusion that management's encouragement invariably was sarcastic or unhelpful.

*Second*, Jones points to the timing of Craven's assignment to the MIE program as evidence that the company was preparing to discharge Jones in retaliation for reporting safety concerns. The Board concluded that the timing of the transfer was "merely coincidental," Board at 10, and was a "legitimate business response to Jones' failure to develop . . . the necessary training modules." *Id.* at 9–10.

Substantial evidence also supports this conclusion. Starkey testified that between April 1999 and January 2000 Jones' progress in developing training modules "was very slow. Very, very slow." JA 613. In his January 2000 self-assessment, Jones admitted that he had failed to address problems with the MIE training module in a timely manner. And at roughly the same time, he requested re-assignment and admitted that "other personnel . . . would do a much better job" with the training program. JA 60. Against this backdrop, it is difficult to second guess Starkey's decision to move Craven, an "experienced . . . , creative and innovative" trainer and problem-solver, JA 621, into MIE training, and equally difficult to second guess the Board's conclusion that the "relatively close proximity of Craven's transfer in February 2000 . . . does not support an inference that [the company] plotted to oust Jones," Board at 10.

Jones persists that this conclusion overlooks two pieces of evidence—that Craven had no prior experience in MIE and that there is no proof that Craven participated in the MIE program before implementation of the RIF on July 5, 2000. That Craven had no specific experience in MIE, which was also true of Jones when he took the job, does not rebut Craven's other proven qualifications, all of which support the transfer decision. Confirming the point, Starkey testified that after Craven was assigned to MIE he was "off and running" on the training program, a conclusion Starkey reached after "checking on at least a weekly, if not daily[,] basis to see where the program was going." JA 639–40.

*Third*, Jones contests his mid-year performance evaluation and claims that it was designed to set him up for the RIF. The Board concluded that the "below goals/expectations" rating for job

knowledge, initiative and interpersonal skills "was a warning that management thought he lacked initiative in solving the problems related to the MIE program," Board at 11, and "was not part of a plan to 'set up' Jones for the upcoming RIF." *Id.*

Several pieces of evidence support this conclusion: Jones agreed to be subject to evaluation when he transferred into the training position and he understood that completion of ninety percent of his assignments on time would be an evaluation criterion; Jones admitted in his self-evaluation to failing to correct problems in the MIE training program in a timely manner; and Jones later requested a transfer due in part to his inability to perform his duties.

Jones counters that this conclusion ignores an entry on his mid-year evaluation sheet admitting that "[Jones] is working towards the correction of a problem he 'INHERITED' that nobody knew had so many problems. He is working to correct these problems but is needing help." JA 62. This entry, however, acknowledges only that Jones inherited a difficult problem; it does not excuse his inability to solve the problem or say that he made adequate attempts to address the problem. Nor does the entry explain how Jones' low ratings score stemmed from his participation in protected activity.

Jones also claims that the Board ignored Danny Bucy's statement that "[t]hey're trying to do to [Jones] what they did to Howie Morehead." JA 543. According to Jones, "Morehead was a former training department employee who was given a bad evaluation and then forced to resign." Jones Br. at 44. But since Jones offers no evidence that Morehead was forced to resign due to

engaging in protected activity, the comparison offers little, if any, insight into the cause of Jones' discharge.

Jones also asserts that because he had never received a less than satisfactory rating on an evaluation before, his "below expectations" rating establishes an intent to retaliate. Again, however, the evidence indicates that he deserved the low rating, even if it was his first one. In addition to the above evidence, Starkey testified that although he expected and wanted Jones to raise safety concerns, Starkey's "chagrin came from the fact [that once] we knew . . . we had a problem - - . . . . [w]e weren't moving aggressively or fast enough to get [it] resolved." JA 636–37. Instead, he testified, Jones supplied "excuse after excuse after excuse after excuse." JA 633. When Jones protested the "below expectations" rating, the human resources department conducted a review and concluded that Jones was "well-qualified [ ] to write modules" but that "[h]is efforts to take advantage of [available] assets were minimal at best." JA 378.

*Fourth*, Jones claims that Bucy shunned him after he engaged in protected activity. According to Jones, Bucy "became very angry" with him for refusing to use the text of an OSHA guideline as a substitute for a training module and thereafter was "cool" toward him. The "timing and context of this change in attitude," Jones complains, were overlooked by the Board when it concluded:

> [T]hough Bucy may have been unhappy about the added responsibility of
> supervising Jones and Craven, and argued with Jones about the OSHA guid[eline],
> his interactions with Jones do not convince us that Bucy had a negative attitude
> toward Jones or that he shunned him. More significantly, even if Bucy's attitude

could be deemed antagonistic, Jones has not adduced sufficient facts for us to infer that this enmity existed because of his protected activity.

Board at 13.

This conclusion, too, is amply supported. In his deposition, Bucy denied any change in attitude towards Jones as a result of being placed in charge of him. He also stated that because he and Jones "were in the same office area," they regularly "discuss[ed] problems," JA 667–68, and that he answered Jones' questions on a daily basis. Jones, moreover, admits that he was not disciplined or hindered in his attempts to perform his job as a result of the alleged argument, and Bucy admitted that Jones was correct to insist on designing a specific module for use in one of the training programs.

*Fifth*, Jones claims that the "arbitrary and subjective nature of the judgments coming from Starkey, Bucy and Fowler" in the May 2000 RIF evaluations as well as the "context in which the competency evaluations took place" demonstrate that the discharge stemmed from his protected activity. Jones Br. at 47. Although the Board conceded that Jones received undeservedly low scores in two of the fifteen job ratings used to evaluate employees before the RIF, it found that management "employed a legitimate method" as well as a "reasonable and fair process to evaluate" the two employees. Board at 14. It also concluded that "Jones ha[d] not established that the [company] managers rated him below Craven because of his protected activity." Board at 13.

Substantial evidence supports these findings. Although he disputes the legitimacy of the RIF evaluation method—calling it subjective and arbitrary as well as claiming that the ratings were never

intended for use in a RIF—Jones does not dispute the legitimacy of management's decision to discharge one of the two employees in the production training division in the RIF, meaning that he or Craven would lose his job. He also concedes that the "competency criteria for the [RIF] evaluation . . . [were established] by upper management," Jones Br. at 48—by people, in other words, that he does not claim wished to retaliate against him. Starkey also testified that a "senior management team allocated the [ratings] to particular jobs such as trainer" and that this list of ratings was used to evaluate all employees with that job description, even those at another plant. JA 629. Despite Jones' claim that the ratings were never intended for use in a RIF, Jones Br. at 46–47, Starkey also testified that one of the reasons the company obtained the list of ratings from an outside consultant was in case it "found [itself] in a situation where [it] had to have an involuntary RIF, [then it] would have a matrix of these competencies, against which to evaluate those being considered for RIF." JA 628–29. Based on this testimony and Jones' concessions, substantial evidence supports the Board's finding that the company employed a legitimate method to evaluate Craven and Jones. And that is all the more true given the setting in which these evaluations took place. In *Barnes v. GenCorp Inc.*, 896 F.2d 1457 (6th Cir. 1990), the court recognized that a Title VII plaintiff alleging an improper discharge in the context of a RIF faces a heightened burden of proof because the RIF itself is evidence of a legitimate reason for the discharge. *Id.* at 1464–65.

Jones next contends that because neither Fowler nor Bucy could "explain the meaning of the [ratings] or how employees were rated in them," Jones' evaluation was "far from objective." Jones Br. at 48. He also points out that when the ALJ questioned Starkey, Starkey explained Craven's

higher rating by referring to anecdotal evidence of Craven's superiority and inadvertently credited Craven for work performed by Jones. That Fowler and Bucy had trouble remembering these details a year after the RIF took place, however, is not unusual and hardly compels the inference that retaliatory animus motivated their evaluations. And that Starkey inadvertently credited Craven for some work performed by Jones (when questioned long after the ratings were given) does not rebut the evidence supporting the Board's conclusion that the ratings were the result of a legitimate method and a fair and reasonable process.

## III.

For these reasons, we deny the petition.