RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 11a0079p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

—————————————

MARK J. HOFFMAN,

            *Petitioner,*

    *v.*

HILDA S. SOLIS, United States Secretary of
Labor,

            *Respondent.*

Nos. 08-4128; 09-3991

On Petition for Review of the United States
Department of Labor, Administrative Review Board.
Nos. LARB-1; LARB 06-141; 2005-AIR-026.

Argued: March 1, 2011

Decided and Filed: March 29, 2011

Before: MOORE, COLE, and ROGERS, Circuit Judges.

—————————————

## COUNSEL

**ARGUED:** Richard R. Renner, Washington, D.C., for Petitioner. Mary J. Rieser,
UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Respondent.
**ON BRIEF:** Richard R. Renner, Washington, D.C., for Petitioner. Paul L. Frieden,
Melissa A. Murphy, UNITED STATES DEPARTMENT OF LABOR, Washington,
D.C., for Respondent.

—————————————

## OPINION

—————————————

ROGERS, Circuit Judge. Petitioner Mark J. Hoffman claims that his employer,
NetJets Aviation, Inc., violated 49 U.S.C. § 42121 ("AIR 21") by denying him
appointment to the position of initial operating experience (IOE) instructor in retaliation
for his reporting aviation safety and/or FAA compliance issues to the company and to
the FAA, activities that are protected from retaliation under AIR 21. Because substantial

1

evidence supports the finding that NetJets proved, by clear and convincing evidence, that it would have denied Hoffman the appointment even in the absence of his reporting activities, the Secretary's denial of Hoffman's complaint must be upheld. Furthermore, neither the ALJ's denial of Hoffman's motion to supplement his complaint, nor the Administrative Review Board's grant of NetJets's motion to strike evidence not in the record, was an abuse of discretion.

NetJets Aviation, Inc. operates a fleet of chartered business jets for the private transportation of its investors. Hoffman is a pilot employed by NetJets since 1997. Hoffman says that NetJets has a practice of encouraging or coercing its pilots to fly planes in an unsafe manner, that it harasses and punishes its pilots who do not comply with its demands to keep flying unsafe planes, and that it uses a chain-of-command structure to keep safety issues in-house and to overcome its pilots' safety or regulatory objections.

Hoffman describes what he considers harassing or retaliatory treatment from NetJets over a number of actions Hoffman took because of such safety or regulatory objections. The first of these incidents involved a fuel leak on Hoffman's plane on October 17, 2001. Hoffman learned that his plane had vented fuel that day while grounded, and during flight on two prior occasions. Hoffman wrote up the plane for a safety problem, though Assistant Chief Pilot Billy Smith and Chief Pilot David Cimarolli protested this action. According to Hoffman, Cimarolli yelled at and used obscenities against Hoffman until Hoffman agreed to refuel the plane, something Hoffman was not comfortable doing. When Hoffman refueled the plane, the fuel again leaked and Hoffman wrote the plane up for the safety problem, again under protest from Smith and Cimarolli. Because of this, Hoffman alleges that he was given a four-day evaluation ride, and that Cimarolli warned him against questioning a program manager's authority. Smith testified that he was not aware of any discipline levied against Hoffman. Smith testified that if there had been such discipline, evidence of it would be in Hoffman's training folder, and no such evidence was there.

Hoffman experienced another in-flight fuel leak on November 5, 2003. Unable to stop the leak, Hoffman diverted the plane for an emergency landing. The plane leaked about 700 pounds of fuel. Although a fireman apparently witnessed the fuel leaking out of the plane's left wing, just as Hoffman described the leak, Smith contended that the fuel could not leak in such a fashion. In June 2004, Hoffman also reported what he considered to be worn nose avionics bay latches. The maintenance department, however, told Cimarolli that there was nothing wrong with the latches. Cimarolli expressed anger at Hoffman for writing up these latches, again shouting at Hoffman and using obscenities. Hoffman was not disciplined for this, however.

The incident to which Hoffman attributes the most significance occurred on July 16, 2004. NetJets directed Hoffman to carry passengers on what is called a maintenance ferry permit (MFP) flight from Denver to Wichita. These particular passengers were not the crew of Hoffman's plane, but pilots for a different type of plane, a Citation V. The FAA issues MFPs when a plane is not considered airworthy to carry paying passengers but may still be flown to a service facility. Hoffman believed that the MFP did not authorize him to carry any non-essential personnel. Hoffman contacted Smith about his concerns, but Smith claimed that his copy of the MFP allowed for "other, additional flight crewmembers as needed." Hoffman asked for a copy of this MFP and Smith faxed him one, but Hoffman noticed that it was not completed to allow passengers (since the "Other" checkbox was not marked). Hoffman again tried to contact Smith, but was not successful.

Hoffman then contacted Dennis Garcia of the local FAA office to clarify the MFP. Garcia told Hoffman that the Citation V crew was permitted to take the ferry flight to Wichita despite the unclear MFP. Garcia said he would correct the MFP to explicitly authorize ferrying the crew by marking the MFP's "Other" box and faxing this corrected copy to NetJets. Hoffman then felt that he could legally carry the Citation V crew. Hoffman again contacted Smith, telling Smith that Hoffman was waiting for the corrected copy of the MFP Garcia mentioned. Though Smith sounded irritated, he said

he would fax this to Hoffman. A few minutes later, Hoffman received a copy of the MFP with the "Other" box checked, and Hoffman ferried the Citation V crew to Wichita.

On August 2, 2004, NetJets suspended Hoffman for three days for "[u]nprofessional conduct in regards to not following the chain of command when contacting the Columbus FSDO (FAA) and unprofessional conduct in the manner in which that exchange was conducted with the Columbus local FSDO." Hoffman filed a grievance over this suspension, on which he prevailed. NetJets was directed to remove all records of this incident from Hoffman's personnel file, and Hoffman was awarded back pay for the three days of missed work.

Hoffman also states that on November 18, 2005, he noted the presence of shattered landing lights on a Cessna CE-750 plane, which he felt presented a safety hazard. Hoffman says that Cimarolli urged him to log this under the minimum equipment list (MEL), which would allow the plane to remain in use until its next scheduled maintenance, but Hoffman refused. Cimarolli denies that he told Hoffman to fly the plane despite the shattered lights. Following this, Hoffman claims that NetJets took him off flying status and required him to attend a disciplinary hearing on November 21, 2005, which Hoffman says was abruptly restyled a "safety meeting" after he demanded the presence of an FAA principal operations inspector. Cimarolli testified that discipline was never an issue at this meeting and that the meeting was held merely to discuss the MEL matter.

Hoffman had long sought appointment to an IOE instructor position, having unsuccessfully applied for one over twenty-five times. He was repeatedly denied the appointment, despite having prior instructor positions, seniority, and what he considers a good flying record. On May 3, 2004, NetJets posted an announcement of IOE instructor position openings. The announcement stated that successful applicants would be "type rated and have been assigned duties as Pilot in Command in the airplane with [NetJets] for at least six months, have advanced knowledge of the airplane systems and [NetJets] procedures." International flight experience was not mentioned. The

collective bargaining agreement provided that, in the case of applicants with equal credentials, the applicant with greater seniority should prevail.

Thirty pilots applied for the IOE instructor positions, including Hoffman. NetJets claims that it ranked the applicants through a point system, based on three categories: international experience, program-manager feedback, and peer feedback. Up to three points could be awarded for each category, for a total of nine possible points per candidate. Hoffman only scored one point; twenty-six of the thirty applicants scored higher than Hoffman. Of these thirty applicants, seven were hired; Hoffman was not one of them. Five of the seven successful applicants had international experience. Jacob Decker, NetJets's director of flight standards, testified that this point system was developed in early 2004 to make the selection process for IOE instructor positions more objective. Decker testified that although NetJets used this point system to evaluate the IOE candidates, the system is not recorded in formal documentation. There was conflicting testimony from assistant director of flight standards Todd Jacob, however, that this point system was not put into place until November 2004, well after Hoffman was denied an IOE instructor position. Jacob admitted, though, that he was not with Decker when Decker ranked the IOE candidates and that it was possible that Decker created the point system and ranked the candidates under that system before November 2004. Decker also testified that NetJets was having trouble finding pilots who were qualified to fly NetJets's international routes, which was why international experience was one of the criteria on which candidates were evaluated.

On August 5, 2004, Hoffman filed a grievance over his denial of an IOE instructor position. Although the Systems Board of Adjustment (SBA) found no violation of the collective bargaining agreement in denying Hoffman's job application, the SBA issued the following recommendation: "The Board recommends that Mr. Hoffman's qualifications and performance be reevaluated to include an in person interview. If it is determined that Mr. Hoffman is qualified for the position, he should be awarded an instructor position."

Though NetJets was not required to accept the recommendations of the SBA, NetJets nonetheless interviewed Hoffman on November 16, 2004. A panel of four managers conducted this interview: Decker; John Martin, director of training; Jim Nichols, manager of training and center standards; and Smith. NetJets claimed that Hoffman interviewed poorly, did not completely answer some of the interview questions, and did not display the level of knowledge expected for an IOE instructor. Decker testified that no interview questions were asked in a confrontational or aggressive manner. Decker and Martin, at least, did not know at the time of the interview whether Hoffman had lodged any safety complaints. Hoffman admitted that he had only limited international experience and that he had had personality conflicts with other employees.

Towards the end of the interview, Smith presented Hoffman with a scenario similar to the July 2004 MFP incident. Smith asked Hoffman about his duties when faced with an MFP Hoffman considers questionable. Hoffman began by replying that he would proceed up through NetJets's chain of command to try to resolve the issue. Smith then asked Hoffman if this was as far as Hoffman would go with the MFP issue, and Hoffman responded, "I would go as far with it as I felt necessary to make sure that things were being done correctly." At this point, Smith said that he had no more questions. Hoffman declined to ask questions of his own or to make a closing statement.

The panel unanimously decided that Hoffman should not be promoted, and on December 8, 2004, Decker informed Hoffman that he was being denied the IOE position. Decker told Hoffman that he did not qualify for the position primarily because Hoffman lacked international qualifications or training (referred to as "ITR" or "ITR Captain"), and that the aforementioned point system and Hoffman's interview performance also played a role. Decker testified that ITR is not a formally recognized position at NetJets; rather, it is an internal mechanism used to determine which pilots could do international training and which could not. Decker also informed Hoffman that Hoffman had received negative feedback from five other undisclosed pilots. Smith testified that the MFP incident had no bearing on Hoffman not getting the position, and denied urging the other

interviewers to deny Hoffman the position.  Hoffman grieved the position denial on January 5, 2005, but NetJets denied the grievance, as did the SBA on appeal.

Hoffman filed a complaint with the Occupational Safety and Health Administration (OSHA) in March 2005.  Hoffman alleged that NetJets had violated the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century (AIR 21), 49 U.S.C. § 42121, by failing to promote him to the IOE instructor position as retaliation for reporting his safety and regulatory concerns to NetJets and the FAA.  Hoffman claims that after this, NetJets effectively blacklisted him from further professional advancement by relieving him of his flying duties from July to October 2005.  Hoffman claims that during these months, he only flew eleven hours, he was not assigned a plane or crew, and he was scheduled to sit in gateway airports with nothing to do.  Hoffman says that he lost at least one job opportunity from a prospective employer during this time because the employer gained an unfavorable impression of Hoffman after seeing him pulling one of these "sitting shifts."  However, NetJets's manager of financial planning and analysis, Dr. Benson, testified that seventy pilots flew less than Hoffman during that time.  Moreover, Hoffman also took time off from June 9 to 19, July 28 to August 7, and October 4 to 6, and he was on a schedule consisting of seven days on duty followed by seven days off duty.

OSHA investigated Hoffman's AIR 21 complaint and denied it on May 5, 2005. Hoffman then requested a hearing before an ALJ, which took place on February 7 and 8, 2006.  Either at this hearing or during the discovery preceding it, NetJets learned that Hoffman had secretly tape recorded hundreds of discussions between him and other NetJets employees, including his November 16, 2004 interview.  On April 21, 2006, NetJets placed Hoffman on administrative leave pending an investigation into whether Hoffman violated NetJets's recordation policy by recording the discussions.  NetJets noted, however, that "any recording determined to constitute 'protected activity' under federal or state whistleblower statutes will not be deemed a violation of the Recordation Policy and no discipline will be issued for engaging in the protected activity."  Hoffman moved to supplement his complaint with allegations that NetJets also violated AIR 21

and the Toxic Substances Control Act, 15 U.S.C. § 2622, by placing Hoffman on administrative leave for tape recording his discussions with NetJets employees. Hoffman claimed that NetJets "maintained an unlawful policy or practice to prevent or discourage employees from protected activities, including but not limited to recording for the purpose of collecting evidence of violations." The ALJ denied this motion.

The ALJ denied Hoffman's complaint on August 4, 2006. The ALJ found that, although Hoffman had engaged in activity protected under AIR 21 when he voiced safety and regulatory concerns, and that Hoffman's denial of the IOE instructor position counted as adverse employment action under AIR 21, NetJets had established by clear and convincing evidence that it would have denied Hoffman the instructor appointment even absent Hoffman's engagement in protected activity.

The Administrative Review Board (ARB) affirmed the ALJ's decision and dismissed Hoffman's complaint on July 22, 2008. The ARB also granted NetJets's motion to strike portions of Hoffman's brief relating to evidence outside of the record. Hoffman appealed, but following this, the court suspended briefing per the ARB's request so that the ARB could consider nineteen of Hoffman's recorded discussions that the ARB had not considered at the time of its decision. One of these recorded discussions was that of Hoffman's IOE instructor interview. After reviewing the recordings, the ARB concluded that the recordings were consistent with the hearing testimony already considered. The ARB then re-affirmed its prior order on June 16, 2009.[1] Hoffman again petitioned for review with this court.

## I.    Denial of AIR 21 complaint

Substantial evidence supports the ALJ's conclusion, as affirmed by the ARB, that NetJets proved by clear and convincing evidence that it would have declined to promote Hoffman to the IOE instructor position even absent Hoffman's safety and regulatory reports. AIR 21, under which Hoffman brings his complaint, prohibits NetJets from

---

[1]The ARB re-issued this order on June 19, 2009 after it discovered that the signature of Administrative Appeals Judge Oliver M. Transue was left off the June 16 order.

discriminating against Hoffman because he provided information to NetJets or to the federal government in relation to any actual or alleged violation of any FAA order, regulation, or standard, or any other provision of federal law related to air-carrier safety. *See* 49 U.S.C. § 42121(a)(1)-(2). To establish that NetJets violated AIR 21, Hoffman must prove by a preponderance of the evidence that he was engaged in protected activity, that he suffered adverse action, and that his protected activity was a contributing factor in the adverse action. *See id.* § 42121(b)(2)(B)(iii); 29 C.F.R. § 1979.104(b)(1). The burden of proof then shifts to NetJets, which can satisfy this burden (and thus prevail on Hoffman's complaint) only if it proves by clear and convincing evidence that it still would have committed the adverse action even if Hoffman had not engaged in the protected activity. *See* 49 U.S.C. § 42121(b)(2)(B)(iv); 29 C.F.R. § 1979.109(a).

The ALJ's findings that Hoffman engaged in protected activity numerous times when he voiced safety concerns, and that his promotion denial constituted adverse action, are not contested on appeal.[2] Hoffman only challenges the ALJ's clear-and-convincing-evidence conclusion. Hoffman argues first, that the court must change the applicable standard of review in light of AIR 21's stricter clear-and-convincing-evidence burden of proof, and second, that the record does not support the finding that NetJets satisfied its burden by such clear and convincing evidence.

Neither point warrants relief. As for the standard of review, AIR 21 itself provides for judicial review pursuant to the standards of the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706. *See* 49 U.S.C. § 42121(b)(4)(A) ("Review shall conform to chapter 7 of title 5, United States Code."). The standard of review provided by the APA is whether the ALJ's findings, as affirmed by the ARB, are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "unsupported by substantial evidence in a case . . . otherwise reviewed on the record of an agency hearing provided by statute." 5 U.S.C. § 706(2)(A), (E). AIR 21 specifically

---

[2] The ALJ did not make a finding about whether Hoffman had proved that the adverse action was caused by his protected activity. The ARB recognized this, but considered it harmless error since the ALJ went on to find that NetJets proved by clear and convincing evidence that it would have committed the adverse action despite Hoffman's protected activity.

provides that a complainant may "request a hearing *on the record*." § 42121(b)(2)(A) (emphasis added). Furthermore, other courts have held that judicial review of the ARB's AIR 21 determinations is conducted under the substantial-evidence standard. *See Barker v. Admin. Review Bd.*, 302 F. App'x 248, 249 (5th Cir. 2008); *Majali v. U.S. Dep't of Labor*, 294 F. App'x 562, 563 n.1 (11th Cir. 2008); *Vieques Air Link, Inc. v. U.S. Dep't of Labor*, 437 F.3d 102, 104 (1st Cir. 2006).

Contrary to Hoffman's argument, this deferential substantial-evidence standard of review is not inconsistent with the clear-and-convincing-evidence standard delineated in AIR 21. Clear and convincing evidence is what NetJets needed to offer to satisfy its burden of proof before the ALJ, once that burden shifted to NetJets following Hoffman's successful presentation of a *prima facie* AIR 21 case. Appellate review of the Secretary's finding that NetJets met its burden of proof by clear and convincing evidence, though, consists of determining whether that finding is supported by substantial evidence, which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "The ARB acts for the Secretary of Labor and is responsible for issuing 'final agency decisions.' To satisfy the substantial evidence standard, the [ARB's] decisions must be supported by 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Sasse v. Dep't of Labor*, 409 F.3d 773, 778 (6th Cir. 2005) (quoting *ITT Auto v. NLRB*, 188 F.3d 375, 384 (6th Cir. 1999)).

Hoffman's argument conflates the ARB's and the court's standard of review with AIR 21's ALJ-level burdens of proof. Moreover, conducting judicial review under an agency-deferential standard like that of substantial evidence does not undermine the strict clear-and-convincing-evidence standard required for the ALJ to rule in NetJets's favor. Applying a deferential standard of review to a finding that could only be reached under a strict standard of proof is hardly unusual. Indeed, courts routinely employ this approach when they review the propriety of jury verdicts: though a jury's finding of guilt must be "beyond a reasonable doubt," a standard of proof even greater than that of clear and convincing evidence, the courts' standard of review is merely whether any rational

trier of fact could have found guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

This court must review the ARB's factual conclusions under the substantial-evidence standard. Reviewing these conclusions under that deferential standard supports upholding the ARB's denial of Hoffman's AIR 21 complaint. Documentary evidence shows that all thirty IOE instructor candidates were evaluated using the same three-part point system, the stated purpose of which was to make the selection of IOE instructors more objective. Hoffman was among the lowest-ranked candidates, placing twenty-seventh out of thirty. None of the three candidates who ranked lower or equal to Hoffman received promotions either; neither did nineteen candidates who ranked higher than Hoffman. Of the three categories considered in the point system, Hoffman received zero points in both the international-experience and program-manager-feedback categories, and one point in the peer-feedback category, giving him a total score of one point. By contrast, the seven successful candidates received total scores ranging from five to nine points, nine being the highest possible score. Though Decker admitted that the point-evaluation system was not contained in any formal documents, he testified that the system was developed in early 2004 and that the candidates were evaluated under the system in the summer of 2004. As this was well before Hoffman's November 2004 interview, this evidence contradicts Hoffman's claim that the point system was only a ruse developed after his interview in order to justify not promoting him.

Also, even though international experience was not listed in the May 2004 IOE instructor position announcement, there was evidence that NetJets was indeed interested in promoting pilots who possessed such experience. This evidence included the following: Decker testified that NetJets was having trouble qualifying pilots to fly their international routes and thus needed instructors who could train pilots in this area; the documentation shows that every candidate was individually evaluated in his or her amount of international experience; five of the seven successful candidates possessed such experience, and of these five, four received three points in the international-experience category, the highest-possible score for the category; and Hoffman was

questioned about his international experience during his interview. This undercuts Hoffman's argument that the international-experience category, like the point system in general, was only a pretext to deny him a promotion. Hoffman points out that two pilots received zero scores for international experience and were promoted nonetheless.[3] However, NetJets never contended that international experience was *required* for the promotion, only that it was preferred. Moreover, there is a stark comparison between these two successful candidates and Hoffman: even without any international-experience points, these two candidates received total scores of five and six, respectively, whereas Hoffman received a total score of only one.

Further, there was evidence that Hoffman did not interview well. Both Martin and Smith testified that Hoffman did not demonstrate the level of knowledge expected of an IOE instructor. As to whether Hoffman answered interview questions correctly, Martin testified, "Not completely. They were fuzzy on the details." Hoffman admitted during the interview that he had no experience flying to Europe or Hawaii, and that he had had personality conflicts with other NetJets employees. Hoffman declined to ask any questions of his own or to make a closing statement. And by his own admission, Hoffman had already unsuccessfully applied for an IOE instructor position at least twenty-five times. A reasonable person could conclude from this record that NetJets had proven, by clear and convincing evidence, that it would have denied Hoffman the IOE instructor position because of his apparent faults as a candidate, regardless of his AIR 21-protected activity.

Hoffman's primary argument is that Smith's question at the end of the interview regarding how Hoffman should deal with a questionable MFP made it impossible for NetJets to provide clear and convincing evidence that it still would not have promoted Hoffman. The hypothetical Smith presented Hoffman with in this closing question was similar to the MFP incident Hoffman had been disciplined for earlier that year.

---

[3] At oral argument, Hoffman claimed that three of the seven pilots selected lacked international experience. According to Joint Exhibit 3, which records the points given to each candidate, only two of the seven pilots selected—Polena and Wallace—received zero points in the international experience category.

Hoffman's response—that he "would go as far with it as [he] felt necessary to make sure that things were being done correctly"—combined with Smith's following statement that he had no further questions for Hoffman, could indeed give the impression that Smith's decision on Hoffman's promotion was based in part on Hoffman's willingness to pursue his MFP regulatory concern. Because Hoffman's actions regarding the MFP issue probably constitute protected activity under AIR 21 (NetJets has not contested this finding, anyway), Smith's question could possibly be viewed as evidence that Hoffman's protected activity contributed in some way to his promotion denial.

That being said, Hoffman overlooks a more fundamental issue. Even if Smith's MFP question is considered evidence that Hoffman's regulatory concerns contributed to Smith's vote in the promotion decision, this goes towards the causation factor of Hoffman's *prima facie* case. In other words, this could perhaps provide substantial evidence supporting a finding that Hoffman satisfied his burden of proof under AIR 21—that his protected activity was a contributing factor in an adverse employment action—and that the burden of proof then shifted to NetJets. However, all the other evidence discussed above regarding Hoffman's objective qualifications and poor interview performance then provides substantial evidence supporting the ALJ's finding that NetJets satisfied its own, shifted burden of proof: that clear and convincing evidence shows that NetJets would have declined to promote Hoffman based on its unfavorable view of his professional abilities, even had Hoffman never engaged in any AIR 21-protected activities. Hoffman's apparent flaws as an IOE instructor candidate would still exist even if Smith had never asked the MFP question or had never been on the interview panel at all.

As a final note on the matter of Smith's MFP interview question, Smith testified that the MFP incident had no bearing on Hoffman's not getting the promotion, that there was no discussion after the interview about safety matters that Hoffman had raised, that Smith did not lobby or urge the other interviewers to not promote Hoffman, and that Smith was not instructed to ask difficult questions or to not promote Hoffman. The ALJ found this testimony to be credible. "This court may not . . . decide questions of

credibility." *Moon v. Transp. Drivers, Inc.*, 836 F.2d 226, 229 (6th Cir. 1987). Decker and Martin also testified that they were unaware at the time of the interview whether Hoffman had filed safety complaints. The interview panel's decision denying Hoffman his promotion was unanimous, and Smith testified that he did not possess any kind of veto power that would ensure that his opinion prevailed over those of the other interviewers.

Hoffman also argues that the point system should have played no role at all in his evaluation following his interview. However, Hoffman offers no evidence to support his conclusory assertion that the three factors utilized in the point system were supposed to be disregarded simply because the SBA recommended that NetJets grant Hoffman an interview. The SBA's recommendation simply states the following: "The board recommends that Mr. Hoffman's qualifications and performance be re-evaluated to include an in-person interview. If it is determined that Mr. Hoffman is qualified for the position, he should be awarded an instructor position." Since NetJets had decided to use the point system's three categories of international experience, program-manager feedback, and peer feedback to determine whether candidates were qualified for the IOE instructor position, it is sensible for NetJets to have looked to these criteria in again denying Hoffman a promotion.

Similarly, Hoffman also argues that the interview panel was not supposed to compare him to the other instructor candidates in making its promotion decision. However, there is at best only conflicting, inconclusive evidence that the panel in fact did this.[4] Moreover, even assuming that NetJets did compare Hoffman to the other candidates, the SBA's formal recommendation did not forbid NetJets from doing so. Hoffman claims that the SBA recommended that he "must not be compared to previous

---

[4] *Compare* Appendix at 154 (interview panel did not refer to other candidates' scores for Hoffman's interview decision) *and id.* ("Q: Were you given instructions by the [SBA] or the ruling that I was supposed to be compared to anyone else? A: They gave us no guidance other than you were—they recommended that we give you an in-person interview."), *with id.* at 156-57 ("Q: So going back to the November 16, 2004 interview, . . . how was the interview to be conducted? How was I to be graded? A: I would say that the—you were granted an interview . . . based on the people that put in for it, to determine if you are the most qualified candidate in that group, or among the most qualified candidate in that group.").

candidates," but the source of this quotation is not the text of the SBA's formal recommendation. Instead, Hoffman is quoting anonymous, handwritten notes purporting to summarize the SBA's grievance hearing. Since the SBA's formal recommendation on Hoffman's grievance does not address the permissibility of comparing him to the other instructor candidates, NetJets cannot be faulted for doing so. Finally, even if the SBA had not envisioned NetJets's comparing Hoffman to the other candidates, this would still only constitute a recommendation that NetJets was not contractually bound to accept.

Substantial evidence therefore supports the ALJ's finding, as affirmed by the ARB, that NetJets proved by clear and convincing evidence that it still would not have promoted Hoffman even in the absence of Hoffman's AIR 21-protected activities. While this conclusion is somewhat troubling because of the possibility that Hoffman was not promoted because of his safety actions, Congress gave primary authority to the Secretary, and not to the courts, to carry out AIR 21. We are required to give deference to the Secretary's factual determinations, as long as they are supported by substantial evidence.

## II.     Procedural rulings

Hoffman also challenges two procedural rulings: (1) the ALJ's denial of Hoffman's motion to supplement his complaint, and (2) the ARB's grant of NetJets's motion to strike evidence in Hoffman's brief that was purportedly not in the administrative record. However, neither the ALJ's denial of Hoffman's motion nor the ARB's grant of NetJets's motion constitutes an abuse of discretion.

First, the ALJ did not abuse its discretion in denying Hoffman's motion to supplement his complaint. Under 29 C.F.R. § 18.5(e), the ALJ could permit Hoffman to amend or supplement his complaint "upon such conditions as are necessary to avoid prejudicing the public interest and the rights of the parties" and "if the [ALJ] determines that the amendment is reasonably within the scope of the original complaint." As the ARB stated when it affirmed the ALJ's denial of this motion, Hoffman had "identified a new post-hearing adverse action arising under a different set of facts and occurrences

than the matter in litigation.  The post-hearing consideration of the new evidence would prejudice NetJets."

The ARB's conclusion was justifiable.  Hoffman's original complaint concerned NetJets's denying him a promotion allegedly in retaliation for his voicing safety and regulatory concerns, whereas his supplemental complaint concerned NetJets's punishing him for allegedly violating its recordation policy by taping discussions with NetJets employees.  While Hoffman is correct that the two matters are related, at least in the sense that NetJets learned of Hoffman's alleged recordation-policy violations through the proceedings of his AIR 21 complaint, this causal connection does not make it an abuse of discretion for the ALJ to decline to consider all these allegations in the same proceeding.  *Cf. Allen v. Reynolds*, No. 89-6124, 1990 WL 12182, at \*2 (6th Cir. Feb. 13, 1990) ("A motion to supplement a complaint under Fed. R. Civ. P. 15(d) is properly addressed to the discretion of the trial court.").  In any case, Hoffman's allegations in his supplemental complaint were later addressed before a different ALJ in January and April 2008, which presumably gave Hoffman a full opportunity to litigate these claims, but without any attendant prejudice to NetJets.

The ARB did not abuse its discretion in granting NetJets's motion to strike evidence purportedly not in the record; in the alternative, any error the ARB committed in granting the motion was harmless.  The ARB justified its decision by correctly noting that "we do not consider evidence outside of the record."  Though the ARB did not identify the evidence stricken by its order, NetJets identified several matters from Hoffman's ARB brief which NetJets sought to have stricken.  These matters consist of the following: (1) background corporate information about NetJets; (2) background personal information about Hoffman; (3) that NetJets has "developed a practice of encouraging, even coercing, pilots to fly planes in an unsafe manner"; (4) information about the November 5, 2003 fuel leak, that Hoffman reported the October 17, 2001 fuel leak under protest from Smith and Cimarolli, and that Smith had knowledge of two previous fuel leaks; (5) information about the November 2005 shattered-landing-lights incident; (6) other incidents of alleged protected activity, including that Hoffman alerted

NetJets in January 2006 that a plane lacked required documentation, and that an assistant chief pilot asked Hoffman in February 2005 to evaluate a plane's inoperative sensor and defer the sensor under an MEL; (7) that NetJets dropped Hoffman's failure to follow the company's chain-of-command policy as a ground for his 2004 suspension when NetJets was informed of the policy's illegality; (8) that Hoffman was denied IOE instructor positions over twenty-five times; (9) that NetJets's assistant program manager told Hoffman that NetJets wanted "go to" pilots as instructors, meaning pilots who would keep safety concerns in-house; (10) that Hoffman's interview was conducted by a panel of interviewers; (11) that in 2005, Hoffman had to sit in airports without flying and that he lost at least one job opportunity during this time; (12) information about Hoffman's suspension for allegedly violating NetJets's recordation policy; (13) that NetJets did not comply with discovery requests; (14) that one pilot who flew less than Hoffman included Robert Stark, who took an extended vacation to China; and (15) that another NetJets employee, John Swint, was terminated for refusing to fly when fatigued, and that Swint's case was settled with his reinstatement.

It is at best unclear whether these fifteen evidentiary matters should have been considered properly within the ARB's record. NetJets argued that none of the above evidence was properly in the ARB's record because it was not introduced at the ALJ hearing or through the post-hearing depositions, and that NetJets would therefore be denied due process because it would not have an opportunity to rebut the new evidence. Hoffman claimed that he submitted all of the above evidence by the April 30, 2006 evidentiary deadline imposed by the ALJ, that NetJets was estopped from objecting to the evidence, and that the objected-to matters were all supported by other record evidence in any case. The ARB was entitled to exercise its discretion in considering these matters not properly within its record, and to strike them accordingly. Regardless of whether the objected-to evidence was actually in the record, though, any error the ARB may have committed in striking it for such reason is harmless because the evidence in question was either irrelevant or was considered by the ARB in its decision anyway. The grant of NetJets's motion to strike was therefore not an abuse of discretion.

The harmlessness of any assumed error on the ARB's part is clear from a review of the fifteen evidentiary matters NetJets moved to have stricken. Of these, matters (1) and (2), background information about NetJets and Hoffman, respectively, are irrelevant to the issue of whether NetJets violated AIR 21. Similarly, matter (3), a conclusory assertion about NetJets's business practices, and matter (9), a speculative interpretation of an employee's comment to Hoffman, do not help prove that NetJets violated AIR 21 specifically by denying Hoffman a promotion. Matter (6) refers to events that allegedly occurred after NetJets denied Hoffman his promotion; thus, it cannot have influenced NetJets's denial of Hoffman's promotion and is irrelevant to proving that NetJets violated AIR 21.

As for matters (5), (7), (8), (10), and (11), the ARB actually discussed these in its decision, either explicitly, by referring to the audio files which Hoffman says establish the matters, or by incorporating the ALJ's exposition of the facts. Since the ARB considered this evidence, Hoffman cannot even show that the evidence was stricken, and thus cannot establish any harm from the ARB's ruling. Matter (12) refers to the issues raised in Hoffman's motion to supplement his complaint. Since Hoffman was properly denied leave to so supplement, the evidence in matter (12) was irrelevant to the case before the ARB. Matters (13), (14), and (15) all raise issues irrelevant to the substantive merits of Hoffman's case. That NetJets allegedly failed to comply with a discovery request (matter (13)) is a separate, unrelated discovery issue. Hoffman does not explain why information about pilot Robert Stark (matter (14)) has any bearing on Hoffman's ability to prove his case. And John Swint's prior lawsuit (matter (15)) certainly does not help prove anything NetJets did with respect to Hoffman. Matter (4) alone, discussing the 2003 fuel-leak incident, mentions evidence potentially relevant to Hoffman's case that was not discussed or referred to by the ARB. However, Hoffman fails to show how this single matter could rebut the ARB's conclusion that NetJets offered clear and convincing evidence that it would have denied Hoffman's promotion anyway, due to the record evidence of his poor credentials and interview showing.

Thus, even if the fifteen objected-to matters actually were in the record and should not have been stricken as supposed non-record evidence, as Hoffman contends, the evidence contained therein would not have affected the outcome of his case. Any error the ARB may have committed was therefore harmless.[5] *See* 5 U.S.C. § 706 ("In making the foregoing determinations . . . due account shall be taken of the rule of prejudicial error.").[6]

The petition for review is denied.

---

[5] Hoffman also states that, "[o]n reconsideration, the ARB did not consider CX 11 or 12 when it concluded that the[se] recordings showed relaxed managers asking normal subjects." On the contrary: the fact that the ARB was able to draw conclusions about these two recordings shows that it *did* consider them. Since the ARB considered these recordings, they were obviously not part of the evidence ordered stricken.

[6] Hoffman also mentions that the ARB did not discuss two of his exhibits: his April 25, 2006 statement of NetJets's continuing violations, and his May 1, 2006 declaration. The ARB did not commit reversible error in striking them. The matters documented in the continuing-violations statement relate entirely to Hoffman's claims over his suspension for allegedly violating NetJets's recordation policy. Because the ALJ properly denied Hoffman's motion to supplement his complaint with these allegations, this evidence was not relevant. As for the declaration, much of it relates to Hoffman's damages, which were not relevant since the ALJ dismissed Hoffman's complaint in the first place, and to alleged instances of what Hoffman considered workplace harassment, which were not relevant because Hoffman has not appealed the dismissal of his hostile-work-environment claim and has accordingly forfeited it. The rest of the declaration simply reiterates the factual allegations behind his AIR 21 claim, which Hoffman already brought up at his hearing and which the ALJ and the ARB discussed in their decisions anyway, and the matter of the recordation-policy suspension, the allegations of which the ALJ properly declined to consider.