**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

EDWARD MIZUSAWA,

        Petitioner,

v.

UNITED STATES DEPARTMENT OF
LABOR,

        Respondent,

-----------------------------------------------

UNITED PARCEL SERVICE,

        Intervenor.

No. 12-9562
(Petition for Review)

**ORDER AND JUDGMENT**[*]

Before **O'BRIEN**, **McKAY**, and **BALDOCK**, Circuit Judges.

This appeal concerns the whistleblower-protection provisions of the Wendell

H. Ford Aviation Investment and Reform Act for the 21st Century (AIR 21),

---

[*]    After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

49 U.S.C. § 42121. In relevant part, AIR 21 prohibits air carriers from discharging or discriminating against an employee who "provided . . . to the employer or Federal Government information relating to any violation or alleged violation of any order, regulation, or standard of the Federal Aviation Administration or any other provision of Federal law relating to air carrier safety." *Id.* § 42121(a)(1). Petitioner Edward Mizusawa filed a complaint with the Occupational Safety and Health Administration (OSHA) asserting that his former employer, the United Parcel Service (UPS), violated AIR 21 when it terminated his employment. After a hearing, an ALJ found in favor of UPS, and the Administrative Review Board (ARB) of the United States Department of Labor affirmed. Our jurisdiction arises under 49 U.S.C. § 42121(b)(4)(A), and we deny Mr. Mizusawa's petition for review.

## I.    BACKGROUND

Mr. Mizusawa began working for UPS in 1984. He was promoted to gateway manager for the Albuquerque and Tucson airports in 2007, and he also was a trainer for UPS's Desert Mountain District, which then comprised New Mexico and Arizona. As gateway manager, Mr. Mizusawa was responsible for all aspects of loading and unloading UPS's planes, including ensuring that operations at the gateways complied with all of UPS's policies and procedures and Federal Aviation Administration regulations.

During his tenure as gateway manager, Mr. Mizusawa reported several safety concerns to UPS that formed the basis of his AIR 21 claim. In 2007, he informed his

supervisor, Terry Christopher, about a weight-and-balance error on an outbound flight. In summer 2008, Mr. Mizusawa complained on several occasions to John Farley, who became his supervisor earlier that year, that employees responsible for cargo placement on the plane—so-called top-deck designees (TDDs)—were not properly trained, needed drug testing, and were committing safety errors. In August 2008, Mr. Mizusawa complained to Mr. Farley that there was inadequate hazardous-materials training in the district. In January 2009, Mr. Mizusawa reported to Mr. Farley that information about hazardous materials on an inbound flight was not properly conveyed to the flight crew and that there were weight-and-balance issues with the plane. And finally, on February 17, 2009, the day he was discharged, Mr. Mizusawa reported to Mr. Farley that there was a weight-and-balance issue on an inbound flight. In general, Mr. Mizusawa thought that, unlike Mr. Christopher, Mr. Farley was not properly addressing his concerns.

During Mr. Mizusawa's time as gateway manager, the Albuquerque gateway failed UPS's National Air Audit in 2007 and 2008. District Manager Craig Wiltz and Operations Manager Bill Conrad met with Mr. Mizusawa after the 2007 audit and advised him that he was responsible for the shortcomings of his subordinate employees. Mr. Wiltz testified that Mr. Mizusawa "didn't really seem to be taking responsibility for the things that were identified in the audit at the time." R., Vol. III at 332. Mr. Mizusawa prepared a written statement that he would resign if the Albuquerque gateway did not pass the next audit. In fact, the gateway did not pass

the next audit, which occurred in July 2008, and Mr. Mizusawa did not resign. Mr. Farley testified that during a roundtable discussion with the auditors, Mr. Mizusawa acted unprofessionally toward the auditors and questioned their qualifications. Mr. Mizusawa claimed that he spoke up about the TDDs during a conference call the next day with the auditors, Mr. Wiltz, and other UPS managers, and Mr. Farley later "told [him] to keep [his] mouth shut, and [they] would fix [the TDD matter] within the district." *Id.*, Vol. II at 46. Willing to give him another chance, and concerned that he was not taking responsibility for the failed audits, UPS placed Mr. Mizusawa on a performance improvement plan. The Albuquerque gateway then passed an audit in January 2009. It also was ranked number one in its national group for 2008, and on January 31, 2009, Mr. Mizusawa received a very high rating on an individual evaluation.

Meanwhile, in October 2008, one of Mr. Mizusawa's part-time supervisors, Zak Abad, asked for permission to shoot a video at the Albuquerque gateway for a school project. UPS has a video policy, which provides that "the use of all recording devices in any UPS facility for anything other than authorized business purposes is prohibited," R., Vol. VII, Tab 36, at 11. After a very brief exchange, and without discussing the request with anyone further up the UPS managerial chain, Mr. Mizusawa gave Mr. Abad permission, instructing him to follow all UPS procedures and certifications and ensure that all non-employees were properly badged. In late November, Mr. Abad brought in a number of non-UPS employees

- 4 -

and shot two scenes. In one scene, an actor portrayed an escaped prisoner being placed in a UPS shipping container, which UPS employees then set on a UPS tug and loaded onto a UPS plane. In the other scene, the actor was seen running out of the belly of the plane on a loading belt.

The Abad video came to UPS's attention in February 2009 when the company was investigating a different video, also shot at the Albuquerque gateway by four different UPS employees, that had been posted on YouTube. After investigating the Abad video and discussing the issue with two human-resource managers, Mr. Wiltz decided to terminate Mr. Mizusawa's employment. Mr. Wiltz asked Mr. Farley to convey the news to Mr. Mizusawa, which he did.

Mr. Wiltz testified that "the primary reason" for his decision was that Mr. Mizusawa "gave the authority for a part-time supervisor and non-employees to come onto our property, use our equipment in an un-work related shooting of a video, and that's against our company policy." *Id.*, Vol. III at 330.[1] Mr. Wiltz also identified a contributing factor—that Mr. Mizusawa had demonstrated "a pattern of poor decisions . . . going back to [the 2007 and 2008] audits," *id.*, and the company had "not been able to correct his decision-making," *id.* at 345. Mr. Wiltz testified that Mr. Farley had no input into his decision and that his decision was not based on Mr. Mizusawa's reports of safety concerns.

---

[1]     UPS also has a policy prohibiting the use of UPS equipment for personal benefit.

The ARB affirmed the ALJ's determination, which was highly fact- and credibility-intensive, that Mr. Mizusawa had not established that any of his reports of safety issues was a contributing factor in UPS's decision to terminate his employment. This petition for review followed.

## II.   DISCUSSION

In an AIR 21 case, we review the ARB's final decision and order under the Administrative Procedure Act, 5 U.S.C. §§ 701-706. *See* 49 U.S.C. § 42121(b)(4)(A). In relevant part, the APA directs that we may overturn the ARB's decision only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). We may set aside factual findings only if they are "unsupported by substantial evidence." 5 U.S.C. § 706(2)(E). "Substantial evidence is such relevant evidence a reasonable person would deem adequate to support the ultimate conclusion." *Anderson v. U.S. Dep't of Labor*, 422 F.3d 1155, 1173 (10th Cir. 2005) (internal quotation marks omitted). "The substantial-evidence standard does not allow a court to displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." *Trimmer v. U.S. Dep't of Labor*, 174 F.3d 1098, 1102 (10th Cir. 1999) (internal quotation marks omitted). Credibility findings are "entitled to great deference." *Id.*

Under AIR 21, a complainant has the initial burden to demonstrate by a preponderance of the evidence that his protected activity was a "contributing factor"

- 6 -

in the personnel decision. *See* 49 U.S.C. § 42121(b)(2)(B)(iii); *see also Hoffman v. Solis*, 636 F.3d 262, 267-68 (6th Cir. 2011) (discussing AIR 21's statutory requirements and burdens). If a complainant does so, the burden shifts to the employer to "demonstrate[], by clear and convincing evidence, that [it] would have taken the same unfavorable personnel action in the absence of [the protected activity.]" 49 U.S.C. § 42121(b)(2)(B)(iv); *see also Hoffman*, 636 F.3d at 268.

We conclude that substantial evidence, as detailed above and explained below, supports the ARB's determination, and we see nothing that suggests the ARB's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A), (E). To hold otherwise would require us to exceed the bounds of our limited review under the APA.

Mr. Mizusawa raises a number of arguments, none of which we find persuasive. He contends that UPS's reasons for firing him changed over time and that this suggests pretext. But the record shows that UPS's reasons were consistent. First, Mr. Mizusawa claims that UPS did not provide a contemporaneous reason, but Mr. Farley testified that he told Mr. Mizusawa he was being discharged because of the "inappropriate use of company property and equipment in an unauthorized time, or something to that effect." R., Vol. II at 177. And District Security Manager Chuck Martinez, who was present when Mr. Farley conveyed the news to Mr. Mizusawa, testified that Mr. Mizusawa was told he "was being discharged for violating UPS policies, for granting unauthorized access to a gateway, and the

unauthorized use of UPS equipment." *Id.*, Vol. III at 322. Like the ALJ, the ARB did not resolve the parties' conflict on this point, but the dispute is immaterial. If Mr. Farley did not state a reason, there is no inconsistency with UPS's later-stated reasons. And if he did state the reasons he and Mr. Martinez identified at the ALJ hearing, it was consistent with the position UPS took in defending Mr. Mizusawa's initial OSHA complaint (which was that UPS fired him for violating its policies regarding the use of its facilities) and with Mr. Wiltz's testimony.

Second, we disagree with Mr. Mizusawa that there were any inconsistences among UPS's OSHA position, Mr. Wiltz's testimony, and the deposition testimony of UPS's corporate representative, Harvey Hill, who was UPS's Desert Mountain Division Employee Relations Manager. Mr. Mizusawa characterizes Mr. Hill's deposition testimony as stating that inappropriate use of UPS facilities was not a reason for the decision, but the record does not support this characterization. Mr. Hill was asked whether it was accurate that UPS fired Mr. Mizusawa for "inappropriate use of facilities and equipment by a subordinate. Claimant granted permission." *Id.*, Vol. II at 162 (internal quotation marks omitted). Mr. Hill responded, "No, I've never seen that code, 'claimant granted permission.' I've never seen that before." *Id.* at 163 (internal quotation marks omitted). Mr. Hill was then asked if there were "other reasons that Mr. Mizusawa was fired[.]" *Id.* (internal quotation marks omitted). Mr. Hill asked for clarification whether they were "talking about the code that we put in or reasons that may have led up to the termination." *Id.*

- 8 -

(internal quotation marks omitted). Mr. Mizusawa's attorney replied that he was "looking for the reasons that led up to the termination." *Id.* (internal quotation marks omitted). Mr. Hill then said there were "other factors," *id.* (internal quotation marks omitted), which we read to mean other than the inappropriate use of UPS facilities and equipment. Mr. Hill identified those "other factors" as Mr. Mizusawa's "behavior as a manager, his unwillingness to correct some of the problems that his boss talked to him about, his overall approach to the process of the improvement plan, uncooperativeness with his boss." *Id.* (internal quotation marks omitted). Viewing the entirety of the exchange rather than the snippet Mr. Mizusawa isolates in his brief, it is clear that Mr. Hill did *not* say that inappropriate use of UPS facilities was *not* a reason for the termination decision. In sum, the record does not support that there were any plausible signs of pretext in the various iterations of the reasons for UPS's termination decision.

Mr. Mizusawa also claims that Mr. Farley was "out to get him," Pet'r's Opening Br. at 6, but there is no evidence that Mr. Farley was involved in the termination decision. Mr. Mizusawa further contends that other employees who violated UPS's video policy were not fired, indicating that UPS did not follow its own zero-tolerance policy with regard to video recordings. But the record does not show that the other employees were similarly situated; only one of the purported comparators, Phil Stevens, was a supervisor who gave permission to an employee to film a video using UPS equipment and personnel. However, Mr. Stevens gave

permission to Mr. Abad only after learning that Mr. Mizusawa, who was his supervisor, had already given permission to Mr. Abad. Furthermore, three of the employees connected with the YouTube video resigned. UPS fired the other employee, but he was reinstated after filing a grievance. Thus, the record does not support Mr. Mizusawa's claim of disparate treatment or that UPS failed to follow its own policy.

Mr. Mizusawa also appears to question the existence and substance of UPS's video policy, but we agree with the ARB: Substantial evidence supports the ALJ's finding that credible testimony established that such a policy was in place and that Mr. Mizusawa should have been familiar with it. The ALJ credited Mr. Hill's testimony that Mr. Mizusawa should have been aware of the video policy because he had taken two training sessions in 2007 that would have covered the policy. The ALJ also credited the testimony of Mr. Martinez, who interviewed Mr. Mizusawa the day he was terminated. Mr. Martinez testified that, during the interview, Mr. Mizusawa indicated that when presented with a request to deviate from UPS's video policy, an employee should "go through their immediate supervisor, who, in turn, would go through their manager, through the division manager, and in essence really just follow our protocol in terms of a chain of command in terms of notification processes." *Id.*, Vol. III at 316. Mr. Mizusawa further claims that he had given permission on other occasions for video shoots and was not disciplined, but there is no evidence UPS was aware of any prior episodes.

Mr. Mizusawa also points to the temporal proximity between his reports of safety violations and his termination. The ARB did not expressly discuss temporal proximity, but the ALJ found that temporal proximity alone was insufficient to show retaliation because intervening events, namely the two failed audits and Mr. Mizusawa's authorization of the Abad video, "could have independently caused [Mr. Mizusawa] to lose his job." *Id.*, Vol. I, Tab 23, at 15; *see also id.*, at 13 (relying on *Barber v. Planet Airways, Inc.*, ARB Case No. 04-056, 2006 WL 1151953, at *5 (ARB Apr. 28, 2006), for the proposition that "'inferring a causal relationship between the protected activity and the adverse action is not logical when the two are separated by an intervening event that *independently* could have caused the adverse action'"). We agree that temporal proximity in this case is insufficient to show a causal connection between Mr. Mizusawa's safety reports and his termination.

Finally, Mr. Mizusawa argues that UPS did not support its same-decision defense with clear and convincing evidence. But UPS was not required to establish that defense because Mr. Mizusawa did not meet his initial burden to demonstrate that his protected activity was a contributing factor in the adverse personnel decision. *See* 49 U.S.C. § 42121(b)(2)(B)(iii), (iv); *see also Hoffman*, 636 F.3d at 267-68.

## III. CONCLUSION

The petition for review is denied.

Entered for the Court

Monroe G. McKay
Circuit Judge