**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 6 1999**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

LENARD E. TRIMMER,

      Petitioner,

v.

UNITED STATES DEPARTMENT OF
LABOR,

      Respondent,

- - - - - - - - - -

UNIVERSITY OF CALIFORNIA,

      Intervenor.

No. 97-9544

---

Appeal from the United States
Department of Labor
(No. 96-072)

---

Stephen M. Kohn, of Kohn, Kohn and Colapinto, P.C., Washington, D.C., for
Petitioner, Lenard E. Trimmer.

Lois R. Zuckerman, Attorney, U. S. Department of Labor, Washington, D.C.,
(Marvin Krislov, Deputy Solicitor for National Operations, Steven J. Mandel,
Associate Solicitor, and Paul L. Frieden, Assistant Counsel for Appellate
Litigation, U. S. Department of Labor, Washington, D.C. with her on the brief)
for Respondent, U. S. Department of Labor.

Daniel H. Friedman, of Simons, Cuddy & Friedman, LLP, Santa Fe, New Mexico (Tanya M. Trujillo, of Simons, Cuddy & Friedman, LLP, with him on the briefs) for Intervenor, University of California.

---

Before **ANDERSON, HENRY,** and **MURPHY,** Circuit Judges.

---

**MURPHY**, Circuit Judge.

---

Lenard E. Trimmer brought an administrative action under 42 U.S.C. § 5851, the whistleblower provision of the Energy Reorganization Act, against his employer, the Los Alamos National Laboratory (the "Lab"), which is owned by the Department of Energy but run by the University of California. Trimmer claimed that the Lab wrongfully delayed an alternate employment-placement process because he had engaged in statutorily protected activity. The Administrative Review Board ("ARB") of the Department of Labor[1] dismissed his complaint. Trimmer appeals on the premise that the Lab's delay in notifying him of his right to engage in an alternate-placement process constituted an

---

[1]The Secretary of Labor created the ARB in 1996. The ARB acts for the Secretary and is responsible for "issuing final agency decisions on questions of law and fact arising in review or on appeal" of a variety of matters, including decisions and recommended decisions by ALJs pursuant to the whistleblower provision of the Energy Reorganization Act of 1974. *See* Authority and Responsibilities of the Administrative Review Board, 61 Fed. Reg. 19,978, 19,978 (1996); *see also Varnadore v. Secretary of Labor*, 141 F.3d 625, 629-30 (6th Cir. 1998).

adverse employment action. This court has jurisdiction pursuant to 42 U.S.C. § 5851(c) and concludes that the ARB correctly decided that the delay did not constitute an adverse action. Accordingly, we **AFFIRM** the decision of the Secretary.

I.    Background

Prior to filing his complaint in 1993, Trimmer had worked at the Lab for almost thirty years. In 1987 he injured his back in a work-related accident. He subsequently worked intermittently and received workers' compensation during six months of rehabilitation. In the summer of 1988 a doctor determined that Trimmer was fit for light-duty work. In December 1988 Trimmer participated in the Lab's "alternate placement" program, a process for finding injured employees new positions suitable to their new physical limitations and work restrictions.[2]

---

[2] The Lab's policy entitled an employee whose work restrictions could not be easily accommodated in the employee's existing position to a process for alternate placement. The Lab's policy did not specify when the alternate-placement process should take place, though it did specify that the search was to last 90 days, after which the employee would be discharged if he had failed to find a new position. An individual on alternate placement was not given preferential consideration for available positions and his medical restrictions were not considered during the search. Rather, his selection for a new position was to be entirely merit-based. The only apparent advantage an employee on alternate placement had over an outside applicant was the networking the employee could conduct while working in a temporary position during the search.

Although at the time alternate placement was successful in only about ten percent of the cases, Trimmer quickly obtained new employment in a different division.

In 1989 and 1990, Trimmer engaged in whistleblowing activity, which included notifying his supervisors of various safety concerns and contacting a congressional subcommittee, an investigative team, the Inspector General of the Department of Energy, and members of the news media to express his safety concerns.

In the fall of 1990 Trimmer filed a grievance against the Lab based upon his failure to obtain a promotion. Soon thereafter his supervisors requested that he stop discussing his grievance with his co-workers because they felt the discussions were disruptive. This request upset Trimmer and he left work. He did not return to work and instead exhausted his remaining sick leave and vacation, eventually going on leave without pay. In early 1991 the Lab notified Trimmer that he was eligible for alternate placement. He responded that he was interested in engaging in another alternate-placement process. Because the Lab concluded he was not able to perform the functions of his previous position, Trimmer and the Lab's Medical Director met during February and March 1991. The two, working together, defined new work restrictions that would allow Trimmer to work regularly without harming his health.

In spring of 1991 the Lab commenced a second alternate-placement search for Trimmer. After a division-wide placement search proved unsuccessful, the search coordinator began a Lab-wide search. This search was temporarily aborted at Trimmer's request because he had applied for early retirement and had begun to receive disability benefits. The placement coordinator nevertheless continued to refer suitable job openings to him. Trimmer was granted disability benefits in August 1991, equivalent to two-thirds of his Lab salary.

Because he did not find a job through the 1991 alternate-placement search and consequently had not worked for over a year, the Lab managers charged with monitoring Trimmer's employment status met on February 13, 1992, and scheduled a meeting for March 2, 1992, to review his status. In the meantime, on February 28, 1992, Trimmer was quoted in a Sante Fe newspaper article which was critical of the Lab's safety procedures. During the March 2, 1992, meeting, the Lab managers agreed that the Lab should send a letter to Trimmer to notify him that he would be discharged unless he actively pursued alternate placement.[3]

---

[3] The University of California, intervenor, contests this interpretation. It argues that there is no evidence the Lab discussed sending Trimmer an alternate-placement notice letter in March 1992 and therefore, contrary to Trimmer's assertion, there was no delay. A close review of the record supports the ARB's conclusion that during the March 1992 meeting, the managers had agreed the discharge letter should be sent but thought its proximity to the publication of the article would appear retaliatory.

The managers were concerned, however, that sending this letter so soon after the publication of the newspaper article could be viewed as retaliatory.

The Lab finally sent a letter to Trimmer on December 9, 1992, notifying him that his employment would be terminated on January 5, 1993, unless he expressed some interest in returning to work and participating in another alternate-placement process. [Hereinafter "discharge letter"]. Trimmer promptly notified the Lab that he wanted to return to work. The Lab's response specified four conditions Trimmer would have to meet in order to continue his employment with the Lab. One of these conditions was that he return to work at a temporary assignment, during which he would search for a permanent position. If at the end of 90 days Trimmer was unable to locate a suitable permanent position, his employment would be terminated. Trimmer did not comply with this condition because he assumed the disability benefits would not be reinstated for six to eight months if he were unable to find a new permanent position. The Lab acquiesced, allowing Trimmer to remain at home while an alternate-placement search was conducted. This acquiescence was unusual, if not unprecedented. This third and final alternate-placement process was unsuccessful and Trimmer was medically discharged on September 16, 1993.

II.    Administrative Proceedings

The Energy Reorganization Act of 1974 (ERA) prohibits any employer from discharging or otherwise discriminating against any employee "with respect to his compensation, terms, conditions, or privileges of employment" because the employee engaged in protected whistleblowing activity.  42 U.S.C. § 5851(a).  In 1992 Congress amended § 5851 of the ERA to include a burden-shifting framework distinct from the Title VII employment-discrimination burden-shifting framework first established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800-05 (1973).[4]  *See* Energy Policy Act of 1992, Pub. L. No. 102-486, § 2902(d), 106 Stat. 2776, 3123-24 (amending 42 U.S.C. § 5851(b)).  Although Congress desired to make it easier for whistleblowers to prevail in their discrimination suits, it was also concerned with stemming frivolous complaints.[5]  Consequently, § 5851 contains a gatekeeping function, which provides that the Secretary cannot

---

[4] The amendment to § 5851 became effective as to claims filed with the Secretary on or after October 24, 1992.  *See* Energy Policy Act of 1992, Pub. L. No. 102-486, § 2902(i), 106 Stat. 2776, 3125.  Accordingly, courts which have used the *McDonnell Douglas* burden-shifting framework to adjudicate ERA claims did so because the complaints were filed prior to that date.  *See, e.g.*, *Kahn v. Secretary of Labor*, 64 F.3d 271, 276 & n.4, 277-78 (7th Cir. 1995); *Bechtel Constr. Co. v. Secretary of Labor*, 50 F.3d 926, 930, 934 (11th Cir. 1995); *see also Stone & Webster Eng'g Corp. v. Herman*, 115 F.3d 1568, 1572 (11th Cir. 1997) (rejecting *McDonnell Douglas* burden-shifting framework in favor of amended § 5851's burden-shifting requirements).

[5] The amendment to § 5851 adding the new burden-shifting framework was titled "Avoidance of frivolous complaints."  Pub. L. 102-486, 106 Stat. 2776, 3123.

investigate a complaint unless the complainant has established a prima facie case that his protected behavior was a contributing factor in the unfavorable personnel action alleged in the complaint. *See* § 5851(b)(3)(A). Even if the employee has established a prima facie case, the Secretary cannot investigate the complaint if the employer can prove by clear and convincing evidence that it would have taken the same unfavorable personnel action in the absence of such behavior. *See* § 5851(b)(3)(B). Thus, only if the employee establishes a prima facie case and the employer fails to disprove the allegation of discrimination by clear and convincing evidence may the Secretary even investigate the complaint.

If, as here, the case proceeds to a hearing before the Secretary, the complainant must prove the same elements as in the prima facie case, but this time must prove by a preponderance of the evidence that he engaged in protected activity which was a contributing factor in an unfavorable personnel decision. *See* § 5851(b)(3)(C); *see also Dysert v. Secretary of Labor*, 105 F.3d 607, 609-10 (11th Cir. 1997) (holding that Secretary's construction of § 5851(b)(3)(C), making complainant's burden preponderance of evidence, was reasonable). Only if the complainant meets his burden does the burden then shift to the employer to demonstrate by clear and convincing evidence that it would have taken the same unfavorable personnel action in the absence of such behavior. *See* § 5851(b)(3)(D).

The ARB noted the uncontested fact that Trimmer had engaged in protected activity by exposing health and safety issues regarding the Lab's storage and disposal of radioactive and toxic substances.[6] It also held, however, that the delay in sending the discharge letter did not constitute an unfavorable personnel action. Instead, the ARB stated that the delay worked to Trimmer's benefit because it extended his employment with the Lab and "widened the window during which he could have found alternate placement with [the Lab]."

In response to Trimmer's claim that the delay had cost him continued employment with the Lab, the ARB concluded that a comparison of Trimmer's employability in the spring of 1992 with his employability in the spring of 1993 would be too speculative to support his claim. Additionally, the ARB noted that, through a friend, Trimmer had actual knowledge of the positions open during the spring of 1992 but had declined to pursue them. Finally, even if Trimmer had proved the postponement prevented him from securing a job with the Lab, the ARB stated that "unless [Trimmer] could further demonstrate that respondent

---

[6] The ARB adopted the Administrative Law Judge's ("ALJ") findings of fact and agreed with the ALJ's recommendation of dismissal. *See* 5 U.S.C. § 557(b) (empowering agency to permit ALJ to make recommendation, but also providing that agency "has all the powers which it would have in making the initial decision"); *see also Carlisle Area Sch. Dist. v. Scott P.*, 62 F.3d 520, 529 (3d Cir. 1995) (stating that agency or board is free either to adopt or reject ALJ's findings and conclusions of law).

expected and intended this result, there would be no basis upon which to establish a violation."

III.    Analysis

The Secretary's decision is reviewed under § 706 of the Administrative Procedure Act. *See* 42 U.S.C. § 5851(c)(1) (incorporating standards of 5 U.S.C. § 706(2)). Consequently, the decision will be set aside only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. *See* 5 U.S.C. § 706(2)(A). Consistent with this level of scrutiny, the Secretary's factual determinations will be set aside only if they are unsupported by substantial evidence. *See id*. § 706(2)(E). The substantial-evidence standard does not allow a court to displace the agency's "'choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*.'" *NLRB v. Walton Mfg. Co.*, 369 U.S. 404, 405 (1962) (per curiam) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)). Matters of law are reviewed *de novo*, giving deference to the Secretary's construction of the ERA if reasonable. *See Bechtel Constr. Co. v. Secretary of Labor*, 50 F.3d 926, 931-32 (11th Cir. 1995) (deferring to Secretary's construction of § 5851 pursuant to *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc*., 467 U.S. 837, 843 (1984)). Because the Secretary's

opinion is in agreement with and based in part on the ALJ's credibility determinations, it is entitled to great deference. *See, e.g.*, *Carroll v. Department of Labor*, 78 F.3d 352, 357 (8th Cir. 1996) (reviewing § 5851 claim). This court reviews the entire record, including the ALJ's recommendation and any evidence contrary to the Secretary's decision. *See Simon v. Simmons Food, Inc.*, 49 F.3d 386, 389 (8th Cir. 1995) (citing *Universal Camera*, 340 U.S. at 488).

Trimmer challenges the ARB's holding that the March 2, 1992, decision to postpone sending him the discharge letter was not an adverse employment decision.[7] Trimmer argues that the alternate-placement process was a term, condition, and privilege of employment and that the Lab had a duty to notify him of his option to engage in the alternate-placement process as soon as it decided he should be afforded that opportunity. By delaying the notice of the alternate-placement process until December 1992, Trimmer argues the Lab denied him the opportunity to be considered for jobs that were open between March and May 1992. He argues that the delay caused him to defer a job search until the spring

[7]Trimmer also argues that the ARB applied the wrong standard because after it decided that the action did not constitute an unfavorable employment decision, it noted in the alternative that unless Trimmer "could further demonstrate that [the Lab] expected and intended [the delay to result in Trimmer's inability to obtain a job with the Lab], there would be no basis upon which to establish a violation." Because we agree with the ARB that the delay did not constitute an adverse employment action, we need not address the ARB's alternate ground for its decision.

-11-

of 1993, when employment opportunities at the Lab were limited because of a reduction in force. Consequently, Trimmer was unable to find employment during this final alternate-placement process and was subsequently medically discharged. These circumstances, Trimmer asserts, necessarily rendered the delay an unfavorable employment action.

The dispositive issue in this case is whether Trimmer carried his burden of proving by a preponderance of the evidence that the ten-month delay in sending him the discharge letter adversely affected his employment. Rather than simply asserting that his employment opportunities would have been better had the alternate-placement search been conducted between March and May 1992, instead of the spring of 1993, Trimmer must prove that he suffered adverse consequences from the delay which he would not have suffered had the letter been sent in March 1992.[8] *See Montadon v. Farmland Indus., Inc.*, 116 F.3d 355, 359 (8th Cir. 1997) ("[T]he action must have had some adverse impact on [the complainant] to constitute an adverse employment action."). He cannot simply rely upon his desire to have been informed earlier of the Lab's decision to finally determine his employment status. *See Greaser v. Missouri Dep't of Corrections*, 145 F.3d 979,

---

[8] Because Trimmer had to prove some harmful consequences as a result of the delay, his reliance upon *Ruggles v. California Polythechnic State University* for the proposition that a complainant need not prove that he would have obtained a particular position is inapposite. 797 F.2d 782, 786 (9th Cir. 1986).

984 (8th Cir. 1998) ("'[N]ot everything that makes an employee unhappy is an actionable adverse action.'" (quoting *Montandon*, 116 F.3d at 359) (intermediate quotation omitted)); *see also Fortner v. Kansas*, 934 F. Supp. 1252, 1267 (D. Kan. 1996) (holding that speculative harm will not constitute adverse employment action), *aff'd subnom. Fortner v. Rueger*, 122 F.3d 40 (10th Cir. 1997).

The following uncontradicted evidence disposes of Trimmer's claim: the ten-month delay in initiating yet another alternate-placement process neither precluded nor hindered him from requesting an alternate-placement process himself or conducting his own job search at the Lab. Indeed, Trimmer was at all times free to apply for positions within the Lab. Moreover, during the time he alleges an alternate-placement search should have been conducted, he was aware of open positions within the Lab through a friend *and* he was notified about an available position but declined to apply at the very time he claims the Lab should have been conducting an alternate-placement search.

Because his employment opportunities with the Lab were neither eliminated nor even restricted, Trimmer's reliance upon *Artrip v. Ebasco Services, Inc.*, and *Sibley Memorial Hospital v. Wilson* is unavailing. In both cases the employer completely eliminated the complainants' employment opportunities. *See Ebasco*, Case No. 89-ERA-23, at 15 (Sec'y Labor, Mar. 21, 1995) (holding that employer's "retaliatory refusal to refer Complainant's name on the [available-

employee] list *eliminated* Complainant's chance of being hired") (emphasis added); *Sibley*, 488 F.2d 1338, 1342-43 (D.C. Cir. 1973) (noting that by refusing to refer any female patients to male nurse, hospital excluded him from those employment opportunities).

Even were this court to compare the hypothetical spring of 1992 alternate-placement search with the 1993 alternate-placement search, Trimmer has produced no evidence to show that his employability would have been greater in the spring of 1992. The evidence showed that alternate-placement searches were successful only approximately ten percent of the time. Furthermore, it appears that the delay benefitted Trimmer. Because alternate-placement searches ended in medical discharge more often than not, had the discharge letter been sent to Trimmer in March of 1992, he likely would have been discharged a year earlier. Trimmer would thus not have been able to extend the disability status he sought to maintain. A claim manager for Trimmer's private insurer met with him in November 1992 and reported that he had no intention of returning to work at the Lab. Trimmer seemed "comfortable in his current state and . . . not motivated for change." Rather than fully participating in an alternate-placement search in 1993 as requested by the Lab, Trimmer received special accommodation to conduct the search from home so that he would not, as he claimed, jeopardize the continuous flow of disability benefits.

IV.  Conclusion

Whistleblower provisions "are intended to promote a working environment in which employees are relatively free from the debilitating threat of employment reprisals for publicly asserting company violations of statutes protecting the environment."  *Passaic Valley Sewerage Comm'rs v. Department of Labor*, 992 F.2d 474, 478 (3d Cir. 1993).  They are not, however, intended to be used by employees to shield themselves from the consequences of their own misconduct or failures.  *See Kahn v. Secretary of Labor*, 64 F.3d 271, 279 (7th Cir. 1995) (rejecting "[plaintiff's] attempt to hide behind his protected activity as a means to evade termination for non-discriminatory reasons").  Trimmer cannot use his whistleblower status to avoid the consequences of his inaction in seeking gainful employment.

Substantial evidence supports the conclusion that Trimmer failed to carry his burden of proving that the delay in sending the discharge letter constituted an adverse employment action.  Accordingly, the Secretary's decision is **AFFIRMED.**