**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**October 9, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

_____

LONNIE FRERICKS,

    Petitioner,

v.

DEPARTMENT OF THE NAVY,

    Respondents,

--------------------------------

EMPOWER OVERSIGHT;
GOVERNMENT ACCOUNTABILITY
PROJECT; TRISTAN LEAVITT;
WHISTLEBLOWERS OF AMERICA,

    Amicus Curiae.

No. 24-9531
(MSPB No. PH-0752-20-0355-I-1)
(Merit Systems Protection Board)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **MATHESON**, **KELLY**, and **BACHARACH**, Circuit Judges.
_____

Petitioner-Appellant Lonnie Frericks appeals from the final order of the Merit

Systems Protection Board ("MSPB" or the "Board") affirming the Department of the

---

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Navy's ("Navy") termination of his employment. Aplt. Br. at 36–37. Exercising our jurisdiction under 5 U.S.C. § 7703(b)(1)(B), we affirm.[1]

## Background

Mr. Frericks served on active duty in the Navy before honorably retiring in 2006. Aplt. Br. at 2; II Joint App. 197–99. In 2008, Mr. Frericks began working as a civilian employee at the Naval Surface Warfare Center Indian Head ("Indian Head") Explosive Ordnance Disposal Department ("EOD"). I Joint App. 173–74; Aplt. Br. at 2. On May 29, 2020, EOD's director, Amanda Vehslage, sustained his removal from his position and federal service, referencing a series of incidents in 2019 involving Mr. Frericks. I Joint App. 107–21. Given the lengthy and extensive record in this case, we summarize relevant events below.

### A. Pre-2019 Incidents

Several events occurred before 2019 that are relevant to this appeal. At the beginning of his time at EOD, Mr. Frericks oversaw funding for Improvised Nuclear Device ("IND") projects. Aplt. Br. at 5; II Joint App. 201. At some point, Mr. Frericks contended that some of the funding set aside for IND projects was not being used for developing tools but was instead being used to pay salaries through what he considered a salary "slush fund." II Joint App. 118–19, 201–04. He later raised these concerns up the chain of command. Id. at 123, 206. He also participated in a Naval Criminal Investigative Services ("NCIS") probe into the matter. Id. at 152.

---

[1] The Navy has dropped its jurisdictional challenge. Aplee. Br. 35–39; Oral Arg. at 12:35–12:50.

On September 27, 2010, Mr. Frericks received an official reprimand, stating that his behavior in a meeting was "disrespectful, overly confrontational, and generally counter-productive[.]" I Joint App. 131. The author noted Mr. Frericks's allegations of wrongdoing and counseled him to raise these concerns to the "appropriate" parties, and not "to your co-workers, our customers, or product users." Id. at 133.

Next, Mr. Frericks learned that, in the 1990s, Indian Head dumped beryllium tools into the Mattawoman Creek after running out of storage space. II Joint App. 269. Around 2014, Mr. Frericks inquired about retrieving the tools but was allegedly told to "be quiet, nobody wants to go to jail" and claimed there was a "big cover up[.]" Id. at 220.

Also in 2014, Mr. Frericks filed an EEO complaint. I Joint App. 153–57. He alleged that he was transferred without being informed it was a permanent reassignment in retaliation for raising the IND funding misuse allegations. Aplt. Br. at 9–11; II Joint App. 54, 201–03. The Navy settled this complaint in 2017. I Joint App. 163–68.

In 2015, Mr. Frericks purportedly received another reprimand for "disruptive conduct which has had an adverse impact on [EOD's] ability to accomplish [its] missions." Id. at 134. Mr. Frericks claims that this reprimand was fabricated and that he never received it. Aplt. Br. at 11–13.

**B. 2019 Incidents**

Mr. Frericks was involved in several incidents in 2019 that led to his termination, which we summarize here. I Joint App. 107–21.

At some point, Mr. Frericks's team placed their 3D printers "under his care." II Joint App. 66. Another employee, Juan Roman-Sanchez, reportedly broke one such printer. Id. at 231. On January 2, 2019, Mr. Frericks confronted Mr. Roman-Sanchez in a hallway. Id. at 234. Mr. Frericks claims that he simply asked, "hey, Juan . . . when were you going to tell me that you broke the machines?" Id. According to Mr. Frericks, Mr. Roman-Sanchez's "demeanor changed" and Mr. Roman-Sanchez began arguing with Mr. Frericks. Id. at 234–35. But Mr. Roman-Sanchez stated that Mr. Frericks "made him feel harassed" by speaking in a loud voice and using threatening mannerisms. I Joint App. 128. Lance Brown, a supervisor, met with both Mr. Frericks and Mr. Roman-Sanchez. Id. at 128–29. His summary describes a two-way argument where both individuals were yelling and making the other feel bullied. Id. The meeting ended in an agreement to place a set of instructions on the 3D printer telling users to notify Mr. Frericks if the machine malfunctions. Id. at 129.

Next, on February 22, 2019, several employees reported to Mr. Brown that Mr. Frericks made them feel unsafe because he displayed characteristics of an active shooter. Id. at 60. As a result, Mr. Frericks's desk was moved to a different location. Id.

4

In early June 2019, construction work took place at the workplace, causing noxious fumes. II Joint App. 131–32. Mr. Frericks suspected that the fumes were dangerous to inhale and attempted to prop open a door for ventilation, but another employee closed it. Id. at 132. Mr. Frericks and Ms. Vehslage agreed that the fumes created a safety issue that should be raised to management. Id. at 53–54. On June 4, Mr. Frericks confronted Chris Lopez, the employee who had been closing the door. I Joint App. 59. He allegedly became aggressive toward Mr. Lopez, yelled at him, and demeaned his Air Force affiliation. Id. at 59, 81. On June 5, Mr. Frericks allegedly yelled again at Mr. Lopez, stating that Mr. Lopez was not human, and that he needed to treat people more humanly. Id. at 59. On June 27, Mr. Lopez sent an email to Ms. Vehslage detailing the event. Id. at 78. Mr. Lopez stated that he believed he was a "victim of [b]ullying . . . and potential [w]ork place violence by Lonnie Frericks[.]" Id. Mr. Lopez claimed that he saw "[r]age . . . in Lonnie's eyes . . . along with his threatening demeanor." Id. He also attached a memo, dated June 20, recounting the incident, in which he alleged that Mr. Frericks was aggressive, confrontational, verbally and physically threatening, and demeaning. Id. at 80–81. Mr. Frericks also prepared a statement on the incident, alleging that he tried to call a "Safety Time Out" and claiming that it was Mr. Lopez who engaged in hostile and aggressive behavior. Id. at 126. He reported his concerns to management, including Ms. Vehslage and Deputy Department Head Denice Lee, but claimed that they ignored them. Id.

5

Next, in the fall of 2019, Mr. Frericks went on a work trip to Virginia Beach with his supervisor, Vern Hull. II Joint App. 83, 241. According to Mr. Frericks, Mr. Hull asked Mr. Frericks to request more time off than was needed so that Mr. Hull could go fishing during work hours in Virginia Beach. Id. at 242–43. Mr. Hull admitted that he went fishing during the trip but claimed that he did not do so during working hours. Id. at 81.

On October 24, 2019, Mr. Hull spoke privately with Mr. Frericks about taking one of Mr. Frericks's projects in a different direction because it was overdue and overbudget. Id. at 79. According to Mr. Hull, Mr. Frericks "became very aggressive and loud," "started punching the computer screen," and got within six inches of Mr. Hull. Id. Mr. Hull believed that Mr. Frericks was displaying characteristics of an active shooter. Id. at 80. Mr. Frericks denied these allegations. Id. at 247–48. Later that day, Mr. Hull sent Mr. Frericks an email confirming that he was taking the project in a different direction but did not mention Mr. Frericks's allegedly violent behavior. I Joint App. 74. On October 25, Mr. Frericks emailed Mr. Hull and several management officials stating that Mr. Hull "never clarified what [he] wanted" regarding the project, and also stating that Mr. Hull "left before noon to go fishing . . . on what was supposed to be a two day trip to Virginia Beach." Id. at 171. On November 2, Mr. Hull reported the computer punching incident to a supervisor and requested that "Mr. Frericks behavior be looked at." Id. at 72–73. However, Mr. Frericks only explicitly raised his claim that Mr. Hull instructed him to falsify his timecard after Mr. Frericks received his notice of proposed removal. Id. at 100.

Also in late October 2019, Mr. Frericks thought that Mr. Hull would not be amenable to discussing a potential project opportunity. II Joint App. 226–27. Mr. Frericks therefore went over Mr. Hull and spoke with patent counsel, Fred Zimmerman, and Amylee Downing from the Command Assessment Office. Id. at 250–51. During an October 31, 2019, meeting with Mr. Zimmerman and Ms. Downing, Mr. Frericks felt overcome by PTSD and broke down crying. Id. at 253. Mr. Zimmerman arranged for Mr. Frericks to receive help, and Mr. Frericks was taken to the hospital in an ambulance. Id. at 253–54. Ms. Lee called Mr. Frericks when he did not report to work the following morning. Id. at 255. Mr. Frericks explained that he was at the hospital. Id. Ms. Lee thereafter placed him on administrative leave. Id. While on administrative leave, Mr. Frericks received a notice temporarily prohibiting him from accessing Indian Head and certain other Navy installations pending an investigation. I Joint App. 76. The Navy sent another letter on November 22, 2019, barring Mr. Frericks from the base "due to [his] threatening actions, anger management issues, self-admitted [PTSD], and severe anxiety." Id. at 77.

**C. Notice of Proposed Removal and Decision on Proposed Removal**

On February 11, 2020, Ms. Lee sent Mr. Frericks a Notice of Proposed Removal, advising that Ms. Lee was recommending termination of Mr. Frericks's employment. Id. at 57–71. It first stated "[f]or background purposes" that Mr. Frericks's "conduct has been a growing concern over the past ten (10) years." Id. at 57. It then outlined specific incidents upon which the proposal was based including:

(1) the October 2019 computer incident with Mr. Hull, (2) the June 2019 incidents with Mr. Lopez, (3) the January 2019 incident with Mr. Roman-Sanchez and the subsequent meeting with Mr. Brown, and (4) the employee reports that Mr. Frericks displayed characteristics of an active shooter. Id. at 58–60. On March 5, 2020, Mr. Frericks submitted a reply, setting forth his version of events. Id. at 91–104.

Ms. Vehslage was the "deciding official" on the proposal. See id. at 145. On May 29, 2020, she issued a Notice of Decision on Proposed Removal, removing Mr. Frericks "from [his] position and the Federal Service, effective 5 June 2020." Id. at 107, 118. The removal notice outlined the reasons for the removal at length. See id. at 107–18. The notice pointed out that Mr. Frericks has "had outbursts, altercations, and physically violent incidents repeatedly over the past ten (10) years" which caused co-workers to feel intimidated and threatened. Id. at 112. It stated that this behavior continued despite reprimands. Id. The notice surveyed Mr. Frericks's disciplinary record, referencing the 2010 and 2015 reprimands, and the 2019 meetings with Mr. Brown (discussing the incident with Mr. Roman-Sanchez) and Mr. Hull (during which the computer incident occurred). Id. at 113. It noted "repeated attempts to discuss and correct [Mr. Frericks's] behaviors toward employees." Id. In a separate section, the notice recounted the computer incident, stating that Mr. Frericks had become "physically violent and verbally abusive to [his] supervisor." Id. at 115. It also noted that Indian Head had "not had an instance of an employee demonstrating such repeated and numerous serious altercations . . . over the last ten (10) years[.]" Id.

8

**D. Procedural Background**

On June 20, 2020, Mr. Frericks appealed his termination to the MSPB. Id. at 1. The Administrative Judge ("AJ") conducted a three-day hearing. II Joint App. 1–283. Twelve witnesses testified including Ms. Vehslage, Mr. Brown, Mr. Hull, and Mr. Frericks. Id. at 2, 142, 274. On June 4, 2021, the AJ issued an initial decision upholding the Navy's action. I Joint App. 173–219.

The initial decision examined the evidence of each incident and made credibility assessments of the witnesses, finding the Navy's witnesses (including Mr. Hull and Ms. Vehslage) credible but finding Mr. Frericks's witnesses (including Mr. Frericks himself) not to be credible in several respects. Id. at 175–93. It concluded that the Navy proved the charge of unacceptable conduct by a preponderance of the evidence. Id. at 193. The AJ then assessed Mr. Frericks's affirmative defenses, including his whistleblower claims under the Whistleblower Protection Act of 1989 ("WPA"), Pub. L. No. 101-12, 103 Stat. 16, as amended by the Whistleblower Protection Enhancement Act of 2012, Pub L. No. 112-199, 126 Stat. 1465. Id. at 199–217.

As to his WPA claims, the AJ assessed the following disclosures and activities to determine whether they were protected: (1) his claims about IND funding misuse (Disclosure One), (2) his concerns about the beryllium tool disposal (Disclosure Two), (3) his EEO complaint (Activity Three), (4) his question about the 3D printer misuse (Disclosure Four), (5) his safety complaints about the noxious fumes (Disclosure Five), and (6) his email discussing Mr. Hull's fishing trip (Disclosure

9

Six).  I Joint App. 201–07, 270.  The AJ found that Disclosure One, Disclosure Two, Activity Three, and Disclosure Five were protected but rejected Mr. Frericks's claims that Disclosure Four or Disclosure Six were protected.  Id. at 201–07, 273.

The AJ then assessed whether the protected disclosures contributed to the Navy's termination decision.  Id. at 207–11.  She found that Disclosure One, Disclosure Two, and Activity Three were not contributing factors.  Id. at 207–08. The AJ suggested Disclosure Five may have contributed to the termination but found that the Navy established it would have taken the same action absent the disclosure. Id. at 208–11.  Thus, the AJ affirmed the removal.  Id. at 217–19.  Mr. Frericks appealed to the MSPB.  See id. at 264.

The MSPB issued its final order on April 5, 2024, denying the petition for review.  Id. at 264–65.  However, it slightly modified the AJ's whistleblower claim analysis.  Id.  First, the Board agreed that neither Disclosure Four nor Disclosure Six were protected.  Id. at 270–75.  It then rejected Mr. Frericks's arguments that the AJ erred by ignoring other protected activity.  Id. at 275–77.  The MSPB also clarified that Mr. Frericks established that Disclosure Five was a factor contributing to his termination.  Id. at 277–79.  Nevertheless, the MSPB agreed that the Navy proved it would have removed Mr. Frericks even absent that disclosure.  Id. at 281–85.  Thus,

the MSPB affirmed the AJ's decision. Id. at 293. Mr. Frericks now appeals the MSPB's holdings as to his whistleblower reprisal claims to this court.[2]

## Discussion

We review the MSPB's legal conclusions de novo. See Lockheed Martin Corp. v. Admin. Rev. Bd., U.S. Dep't of Lab., 717 F.3d 1121, 1129 (10th Cir. 2013); see also Brenner v. Dep't of Veterans Affs., 990 F.3d 1313, 1322 (Fed. Cir. 2021). We will otherwise affirm the MSPB's decision unless it is "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule or regulation having been followed; or (3) unsupported by substantial evidence." Baca v. Dep't of the Army, 983 F.3d 1131, 1138 (10th Cir. 2020) (quoting 5 U.S.C. § 7703(c)). "The [B]oard abuses its discretion when it rests its decisions on factual findings unsupported by substantial evidence." Id. (quoting Kirkendall v. Dep't of Army, 573 F.3d 1318, 1321 (Fed. Cir. 2009)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. at 1140 (quoting NLRB v. U.S. Postal Serv., 486 F.3d 683, 687 (10th Cir. 2007)). It "requires more than a scintilla but less than a preponderance of the evidence." Lockheed Martin Corp., 717 F.3d at 1129 (quoting Hall v. U.S. Dep't of Lab., 476 F.3d 847, 854 (10th Cir. 2007)). The

---

[2] Mr. Frericks raised other claims below, including disability discrimination and retaliation under Title VII, but only appeals his whistleblower reprisal claims. I Joint App. 193–99; 285–91.

11

substantial-evidence standard precludes us from "displac[ing] the [MSPB's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." Id. (quoting Trimmer v. Dep't of Lab., 174 F.3d 1098, 1102 (10th Cir. 1999)).

Where the MSPB's "opinion is in agreement with and based in part on the [AJ's] credibility determinations, it is entitled to great deference." Id. (quoting Trimmer, 174 F.3d at 1102); see also Purifoy v. Dep't of Veterans Affs., 838 F.3d 1367, 1373 (Fed. Cir. 2016) (requiring deference to AJ's explicit and implicit credibility findings). We "consistently defer[] to the credibility determinations of the fact finder because 'he or she is uniquely able to observe the demeanor . . . of the claimant in a direct and unmediated fashion.'" Baca, 983 F.3d at 1140 (quoting White v. Barnhart, 287 F.3d 903, 910 (10th Cir. 2001)). At bottom, this deferential standard precludes us from "substitut[ing] [our] judgment for that of the MSPB." English v. Merit Sys. Prot. Bd., No. 23-9526, 2023 WL 8851292, at *2 (10th Cir. Dec. 21, 2023) (quoting Williams v. Rice, 983 F.2d 177, 180 (10th Cir. 1993)).

Mr. Frericks contends that the Navy unlawfully terminated him in violation of the WPA. Aplt. Br. at 37, 41. The WPA prevents agencies from terminating federal employees for whistleblowing. See Baca, 983 F.3d at 1138; 5 U.S.C. § 2302(b)(8). When assessing such whistleblower reprisal claims, the MSPB employs a burden-shifting framework. First, the agency-employer must prove its charges against the employee by a preponderance of the evidence. Campbell v. Dep't of Army, 123 M.S.P.R. 674, 680 (2016). Then, the employee may raise and show, by a

12

preponderance of the evidence, affirmative defenses, including that he made protected disclosures and that those protected disclosures were a "contributing factor" to the agency's decision. Id.; 5 U.S.C. § 2302(b)(8). The burden then shifts back to the agency to show by clear and convincing evidence that it would have taken the same action against the employee in the absence of his protected disclosure. Campbell, 123 M.S.P.R. at 680. The Board generally affords deference to the deciding official's removal decision. See Shaw v. Dep't of Air Force, 80 M.S.P.R. 98, 118 (1998).

On appeal, Mr. Frericks alleges that the MSPB erred by (1) assessing each of his protected disclosures individually rather than considering the record as a whole when assessing the "contributing factor" element, (2) holding that two of his disclosures (his question to Mr. Roman-Sanchez about breaking the 3D printer and his disclosure to Mr. Hull about time-card fraud) and certain other activities were not protected, (3) finding that all but one of his protected activities were not contributing factors in his removal, and (4) holding that the Navy showed by clear and convincing evidence that it would have removed Mr. Frericks absent his protected activities. See Aplt. Br. at ii–iii.

For the reasons stated below, we hold that, even if Mr. Frericks could show his protected activities were a contributing factor to his termination, the Navy established by clear and convincing evidence that it would have terminated him in the absence of those activities. I Joint App. 207–11. Therefore, we do not address his first claim that the Board erred by assessing his protected disclosures individually.

13

We address his remaining arguments below and find the totality of his arguments to be unavailing. Therefore, we affirm the Board's decision.

### A. The MSPB Did Not Err in Holding That Disclosure Four and Disclosure Six Were Not Protected.

Mr. Frericks argues the MSPB erred in holding that two of his actions were not protected disclosures: (1) his question to Mr. Roman-Sanchez regarding the 3D printer (Disclosure Four), and (2) his email to supervisors which included a statement that Mr. Hull went fishing during a business trip (Disclosure Six). Aplt. Br. at 47–53. He also claims that the Board erred by failing to recognize as protected activity (1) his refusal to falsify his own timecard at Mr. Hull's request, (2) his refusal to work in the noxious fumes, and (3) his participation in the NCIS investigation. Aplt. Br. at 54–55, 57 (claiming that direct evidence links his protected activities to his removal). Mr. Frericks hardly develops these arguments, let alone engages with the analysis below. For example, concerning the alleged refusal to falsify his own timecard, the MSPB cited a lack of supportive evidence and an adverse credibility determination. I Joint App. 276. We will not consider arguments that are "conclusory" and "underdeveloped" because they are "inadequately briefed and [therefore] waived." Valdez v. Macdonald, 66 F.4th 796, 834 (10th Cir. 2023). We address his arguments as to Disclosures Four and Six here.

A protected disclosure is one "that the appellant reasonably believes evidences any violation of any law, rule or regulation, gross management, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or

14

safety." Bradley v. Dep't of Homeland Sec., 123 M.S.P.R. 547, 551–52 (2016) (citing 5 U.S.C. § 2302(b)(8)). "The proper test for determining whether an employee had a reasonable belief that his disclosures were protected is whether a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the employee could reasonably conclude that the disclosure evidenced one of the circumstances described in 5 U.S.C. § 2302(b)(8)." Id. at 552. The employee need not prove that the disclosed conduct violated one of the enumerated circumstances. Scoggins v. Dep't of Army, 123 M.S.P.R. 592, 601 (2016). Instead, he need only show that the "matter disclosed was one that a reasonable person in his position would have believed evidenced any of" those circumstances. Id. at 602.

### 1. Disclosure Four

Recall that, in January 2019, Mr. Frericks was involved in an incident with Mr. Roman-Sanchez after the latter allegedly broke a 3D printer. According to Mr. Frericks, he simply asked Mr. Roman-Sanchez, "when were you going to tell me that you broke the machines?" II Joint App. 234. Mr. Frericks alleges that this question was a protected disclosure because he raised a violation of his employer's "shop rule." Aplt. Br. at 47–48. That rule purportedly required Mr. Frericks's approval before using the 3D printer and required that employees report any damage to him. Id. The MSPB found otherwise because Mr. Frericks's "question did not clearly implicate any identifiable violation of law, rule, or regulation." I Joint App. 271.

15

To be protected, a disclosure must "clearly identify" the alleged rule violation, and "must be specific and detailed" rather than make "vague allegations of wrongdoing." Salerno v. Dep't of Interior, 123 M.S.P.R. 230, 235 (2016). The Board, citing to both hearing testimony and Mr. Frericks's own written response to his proposed removal, found that he had, at best, "informal authority" over the printer. I Joint App. 272. Indeed, as the Board notes, there must have been some ambiguity about his authority given that it was only after this incident that Mr. Frericks's supervisor placed written instructions on the printer telling users to notify Mr. Frericks if the machine malfunctions. Id. at 129, 272. Under the substantial-evidence standard of review, we see no reason to overturn the Board's factual findings. Accordingly, the Board's conclusion that Mr. Frericks's question only "vaguely impl[ied] some sort of wrongdoing" but did not clearly identify any such wrongdoing is supported. Id. at 273. Therefore, we hold that the MSPB did not err in denying protection to Disclosure Four.

### 2. Disclosure Six

Mr. Frericks also argues his October 2019 email to management regarding Mr. Hull's decision to go fishing during a work trip was a protected disclosure, claiming that he disclosed "evidence of time card fraud" in the email. Apt. Br. at 51–53. The AJ found that this email was not protected because (1) Mr. Frericks only asserted that Mr. Hull falsified travel documents after his removal and (2) the timing of the email (after a project was taken away) made it doubtful that Mr. Frericks "reasonably believed" he was disclosing a violation given his "self-interest and potential bias

toward [Mr.] Hull" at this time.  I Joint App. 206–07.  The MSPB agreed.  Id. at 274–75.

On appeal, Mr. Frericks argues that this analysis was legal error because the WPA prohibits consideration of the employee's motive and timing for making a statement when deciding whether it is protected.  Aplt. Br. at 53; 5 U.S.C. § 2302(f)(1)(C), (G).  However, when assessing the reasonableness of the employee's belief, "[a] purely subjective perspective of an employee is not sufficient even if shared by other employees."  Lachance v. White, 174 F.3d 1378, 1381 (Fed. Cir. 1999).  And while a disclosure cannot be denied protection merely based upon motive, "we also would expect the [B]oard to consider personal bias or self-interestedness in the matter."  Id. at 1381; 5 U.S.C. § 2302(f)(1)(C).  "The WPA is not . . . a shield for insubordinate conduct."  Lachance, 174 F.3d at 1381.

Although the AJ and MSPB considered Mr. Frericks's motive and timing in denying protection to Disclosure Six, they were not the only bases for their conclusions.  Instead, the AJ and MSPB evaluated the attendant circumstances in concluding that self-interest and bias undermined the reasonableness of the belief he was disclosing wrongdoing covered by statute.  I Joint App. 206–07, 273–75; Lachance, 174 F3d at 1381.  The AJ determined that Mr. Hull's testimony about how he spent his time in Virginia Beach was credible, and that Mr. Frericks's allegations were not, based in part on "inconsistencies" in his claims, as well as the fact that he only alleged Mr. Hull instructed him to falsify travel documents after the Navy proposed Mr. Frericks's removal.  I Joint App. 181, 206–07.  She also found Mr.

17

Frericks not to be credible because he "tended to over-explain his actions and digressed by providing details about [unrelated] events[,]" noting that his answers even to "the simplest of questions" were "drawn-out and indirect." Id. at 178. Both the AJ and the MSPB relied on these determinations to hold that Mr. Frericks's beliefs of wrongdoing were not reasonable. Id. at 206–07, 274–75. "As an appellate court, we are not in position to re-evaluate these credibility determinations, which are not inherently improbable or discredited by undisputed fact." Pope v. U.S. Postal Serv., 114 F.3d 1144, 1149 (Fed. Cir. 1997). Thus, any allegation that Mr. Hull falsified his timecard lacked any factual basis and was "based purely on speculation, not a reasonable belief" of illegal activity. Ramos v. Dep't of Treasury, 72 M.S.P.R. 235, 240–41 (1996). Accordingly, the Board did not make a legal error in denying protection to Disclosure Six.

## B. The MSPB Correctly Held That Mr. Frericks's Protected Disclosures Were Not a Contributing Factor in His Termination.

Next, Mr. Frericks argues that the MSPB erred by holding that all but one of his protected disclosures, his safety complaints about the noxious fumes (Disclosure Five), were not contributing factors in his removal. Aplt. Br. at 55–64. "To prove that a disclosure was a contributing factor in a personnel action, the appellant only need demonstrate that the fact of, or the content of, the protected disclosure was one of the factors that tended to affect the personnel action in any way." Mastrullo v. Dep't of Lab., 123 M.S.P.R. 110, 119 (2015). The employee may show that protected activity was a contributing factor to his termination through direct or

18

circumstantial evidence.  See 5 U.S.C. § 1221(e); Mastrullo, 123 M.S.P.R. at 119.

Because we determined that Disclosures Four and Six were not protected, we only

address Mr. Frericks's arguments that the remaining disclosures and activity —

Disclosure One, Disclosure Two, and Activity Three — were contributing factors to

his termination.

As to the remaining protected disclosures and activity, the AJ assessed the

testimonial and documentary evidence before her and determined that the instances

were too remote in time or that Mr. Frericks failed to establish any connection

between the disclosures and the people involved in his removal that would indicate

those disclosures contributed to his termination.  I Joint App. 208–09.  She based this

determination in part on the testimony of Ms. Vehslage, whom she found credible,

and the testimony of Mr. Frericks, whom she did not find credible.  Id. at 209.  The

AJ pointed to their respective deliveries and demeanors during their examinations, as

well as the consistency of their testimonies, to support her determination.  Id.  The

MSPB agreed.  Id. at 279–81.

Mr. Frericks advances several arguments to challenge the MSPB's holding.

Aplt. Br. at 56–64.  But his arguments primarily dispute how the MSPB weighed the

evidence before it.  For example, he argues that the proposed and final removal

letters' references to Mr. Frericks's conduct "over the past ten (10) years" are direct

evidence that the Navy relied on all of his prior protected activity to terminate him.

Id. at 56–57.  He also argues that Ms. Vehslage "changed her tune" while testifying

at his hearing and shifted explanations to claim that only his conduct in 2019 was the

19

cause for his removal. Id. at 57–59. Additionally, he contends that the Navy relied upon past conduct, including the 2015 reprimand, and the fact he reported certain of his concerns outside of the chain of command in its removal decision. See Aplt. Br. at 61–64. We are not persuaded.

The Navy's broad, general statement as to his conduct over the preceding ten years is not direct evidence that he engaged in protected activity, or that any such activity contributed to his termination. See Champagne Metals v. Ken-Mac Metals, Inc., 458 F.3d 1073, 1083 (10th Cir. 2006) (holding direct evidence does not require inferences to reach desired conclusion). Mr. Frericks also chooses to ignore references in the removal orders to his "actions, posture, tone of voice, and words" for bullying and intimidating co-workers and supervisors and disrupting the workplace, as well as detailed descriptions of the 2019 incidents that led to his termination. See I Joint App. 7–9, 112.

His other arguments, including Ms. Vehslage's ostensibly changing and shifting explanations as to his removal and the Navy's reliance on other past conduct, turn largely on how the AJ and MSPB weighed evidence and judged witness credibility. Ms. Vehslage testified that she only considered information on Mr. Frericks's conduct before 2019 as "background context to note that Mr. Frericks had been on notice at that point[,]" and that she "did not review [that conduct] as part of [her] decision." II Joint App. 28. She also testified that her decision to terminate him was based solely on the 2019 incidents. Id. at 31. Critically, the AJ, as fact finder, found her testimony to be credible and Mr. Frericks's testimony to not be

credible.  I Joint App. 209.  We defer to those determinations.  Lockheed Martin

Corp., 717 F.3d at 1129; Baca, 983 F.3d at 1140.

Accordingly, we find that the MSPB's findings were supported by substantial

evidence and hold that the Board did not err in holding that Disclosure One,

Disclosure Two, and Activity Three were not contributing factors to his removal.

**C. The MSPB Correctly Held That the Navy Would Have Removed Mr.**

**Frericks Absent His Protected Disclosures.**

Finally, Mr. Frericks argues that the MSPB erred in holding that the Navy

proved that it would have removed him absent his protected activities.  Aplt. Br. at

64–79.

Even if the MSPB finds that a protected disclosure was a contributing factor to

an employee's termination, it cannot reverse an employee's termination by an agency

if "the agency demonstrates by clear and convincing evidence that it would have

taken the same personnel action in the absence of such disclosure."  5 U.S.C.

§ 1221(e)(2).  This is a "high burden of proof."  Smith v. Gen. Servs. Admin., 930

F.3d 1359, 1366 (Fed. Cir. 2019) (quoting Whitmore v. Dep't of Lab., 680 F.3d

1353, 1367 (Fed Cir. 2012)).  To meet this burden, the evidence must "produce[] in

the mind of the trier of fact an abiding conviction that the truth of a factual

contention is highly probable."  Biswas v. Dep't of Veterans Affs., 127 F.4th 332,

339 (Fed. Cir. 2025) (internal quotations omitted) (quoting Miller v. Dep't of Just.,

842 F.3d 1252, 1257–58 (Fed. Cir. 2016)).  We must consider all pertinent evidence

21

when determining whether this standard has been met — not just the evidence that supports the conclusion reached below.  Whitmore, 680 F.3d at 1368.

In the whistleblower context, we apply the "Carr factors" from Carr v. Social Security Administration, 185 F.3d 1318, 1323 (Fed Cir. 1999), to determine whether the employer has established that it would have taken the adverse personnel action absent the protected disclosure.  English, 2023 WL 8851292, at *5; Carr, 185 F.3d at 1323.  Under Carr, we consider three nonexclusive factors: (1) "the strength of the agency's evidence in support of its personnel action;" (2) "the existence and strength of any motive to retaliate on the part of the agency officials who were involved in the decision;" and (3) "any evidence that the agency takes similar actions against employees who are not whistleblowers but who are otherwise similarly situated." English, 2023 WL 8851292, at *5 (quoting Carr, 185 F.3d at 1323).  The employer does not have an affirmative duty to prove that every Carr factor weighs in its favor. Whitmore, 680 F.3d at 1374.  And the MSPB "does not view these factors as discrete elements," but rather "weigh[s] the factors together to determine whether the evidence is clear and convincing as a whole."  Phillips v. Dep't of Transp., 113 M.S.P.R. 73, 77 (2010); see also Whitmore, 680 F.3d at 1368 ("Evidence only clearly and convincingly supports a conclusion when it does so in the aggregate considering all the pertinent evidence in the record[.]")

Mr. Frericks's challenge to the MSPB's holding largely rests on disputing the weight of the evidence and the AJ's credibility determinations.  Under our deferential standard of review, we affirm.

22

### 1. First Carr Factor

As to the first factor, the MSPB found that "the [Navy's] evidence in support of its removal action, which was based on incidents in January, June, and October 2019, is strong." I Joint App. 282. It pointed to "various documentary and testimonial evidence pertaining to each [of the three] incident[s]" that showed "a pattern of increasingly discourteous, aggressive, and even violent behavior[.]" Id. And it noted that Mr. Frericks generally did not deny that the incidents occurred, but merely responded by "deflect[ing] blame[.]" Id. at 283. Importantly, the MSPB noted that, to the extent Mr. Frericks disputed his alleged misconduct, the AJ made "well-reasoned credibility findings in favor of the agency's version of events" that the Board adopted. Id.

Mr. Frericks disputes the MSPB's determination that he engaged in "discourteous, aggressive, and . . . violent behavior." Aplt. Br. at 67–69; I Joint App. 282. But to support his argument, he challenges the AJ's and MSPB's factual findings and credibility determinations as to each of the three cited incidents, claiming, inter alia, that the Navy failed to corroborate some of the events at issue, only produced one of the witnesses involved in each of the incidents at the hearing, and failed to consider other evidence. See Aplt. Br. at 67–71.

Once again, these arguments primarily rest on the proposition that the MSPB should have adopted Mr. Frericks's view of the evidence and witness credibility rather than the Navy's. However, Mr. Frericks cites to no authority that the MSPB should have adopted his view, or that we should either. To the contrary, we cannot

23

"displace the [MSPB's] choice between two fairly conflicting views[.]" Lockheed Martin Corp., 717 F.3d at 1129 (quoting Trimmer, 174 F.3d at 1102). Nor can we "substitute [our] judgment for that of the MSPB." English, 2023 WL 8851292, at *2 (quoting Rice, 983 F.2d at 180). True, only one of the three individuals involved in the three incidents testified before the AJ, but the MSPB found other evidence, including contemporaneous reporting, to support its findings. I Joint App. 286. And to the extent that Mr. Frericks's testimony conflicted with the testimony of the Navy's witnesses, the MSPB determined that the AJ made "well-reasoned credibility findings" in favor of the Navy's witnesses over Mr. Frericks's testimony. Id. at 283. For example, she noted that Ms. Vehslage's testimony was "calm and composed," "internally consistent," and lacked "bias or retaliatory motive[.]" Id. at 209. She similarly found Mr. Hull to be credible because his answers during examinations were "straightforward and succinct" and nothing about his "demeanor or tone of voice suggested any animosity or bias toward the appellant." Id. at 178. In contrast, the AJ found at various points during the hearing that Mr. Frericks's testimony was "circuitous and didactic," that his demeanor was "exaggerated and affected," and that "his tone occasionally evidenced disdain for certain agency employees, particularly management." Id. at 178, 190. We afford those findings great deference. Lockheed Martin Corp., 717 F.3d at 1129; Baca, 983 F.3d at 1140.

Mr. Frericks's contention that the MSPB refused or failed to consider certain evidence is also unavailing. First, although the Board must "consider all pertinent evidence . . . it need not discuss each piece of evidence in its decision." Baca, 983

24

F.3d at 1138.  The MSPB's failure to discuss specific claims or contentions does not mean that it ignored them in reaching its decision, and "we will not presume that the [MSPB] ignored evidence[.]"  Id. at 1138–39.  Second, the MSPB did consider Mr. Frericks's arguments challenging the AJ's findings as to the Carr factors but did not find them meritorious.  I Joint App. 284.

In short, Mr. Frericks asks us to overturn the MSPB's conclusions by accepting his version of events over the Navy's.  But as we have explained, the MSPB rested its well-reasoned conclusions based on factual findings supported by substantial evidence.  Baca, 983 F.3d at 1138.  Thus, we find that the Board did not err as to the first Carr factor.[3]

### 2.  Second Carr Factor

As to the second factor, the MSPB recognized that the noxious-fumes disclosure was relayed to both officials involved in Mr. Frericks's removal (Ms. Lee and Ms. Vehslage), who he claimed ignored the complaints.  I Joint App. 283.  However, the MSPB noted that, by Mr. Frericks's own telling, everyone aware of this disclosure "either disagreed with [him] and thought the remedial measures implemented . . . were sufficient, or they had minimal interest in the matter."  Id.  On this basis, the Board determined that the record supported the conclusion that the

---

[3] Mr. Frericks also claims that the Navy's use of the 2015 reprimand, which he maintains is fake or false, is evidence of the Navy's guilty conscience and prevents it from meeting the clear and convincing standard.  Aplt. Br. at 73; I Joint App. 253–54 (arguing that such evidence creates an inference that the entire case is weak and unfounded).  We think that considerably overstates the significance of the prior reprimand in the context of the specific and direct findings of the AJ and the MSPB.

implicated officials might have had <u>some</u> motive to retaliate, "but not so much so that it causes us to doubt . . . the agency's removal action." <u>Id.</u> at 283–84.

Mr. Frericks argues that the agency officials — specifically, Ms. Vehslage, Mr. Lopez, and Mr. Hull — all had motive to retaliate against him for his disclosures, satisfying the second <u>Carr</u> factor. Aplt. Br. at 74–75. We reject Mr. Frericks's arguments as to Mr. Lopez and Mr. Hull because, under the second <u>Carr</u> factor, "it is 'the existence of any motive to retaliate on the part of the <u>agency officials who are involved in the decision to take disciplinary action</u>' that is to be considered." <u>Carr</u>, 185 F.3d at 1326 (emphasis added) (alterations omitted) (quoting <u>Geyer v. Dep't of Just.</u>, 70 M.S.P.R. 682, 687 (1996)). The retaliatory motives of employees who merely "witnessed, and were affected by, [Mr. Frericks's] conduct" are irrelevant. <u>Id.</u> Thus, we need only consider any retaliatory motives of those involved in his removal, namely Ms. Vehslage and Ms. Lee.

Mr. Frericks claims that Ms. Vehslage had motive to retaliate after his disclosure of misused IND funds. Aplt. Br. at 74–75. However, there is no evidence that this disclosure created a retaliatory motive except for Mr. Frericks's own testimony that the funding misuse would have been "very beneficial to her." II Joint App. 208. In contrast, Ms. Vehslage testified that she did not consider any of Mr. Frericks's protected activities as a factor in his removal. <u>Id.</u> at 35. We note once again that the AJ found her credible and Mr. Frericks not credible, and we afford those findings great deference. I Joint App. 209; <u>Lockheed Martin Corp.</u>, 717 F.3d at 1129; <u>Baca</u>, 983 F.3d at 1140. On this basis, we find that there was substantial

26

evidence for the MSPB's conclusion that whatever slight motive Ms. Vehslage may have had due to Mr. Frericks's protected disclosure about the noxious fumes was "not so much so that it causes us to doubt . . . the agency's removal action." I Joint App. 283–84; see also Mottas v. Dep't of Army, 720 F. App'x 912, 918 (10th Cir. 2017) ("Substantial evidence supports the Board's determination that the Agency had only a slight motive to retaliate[.]"). Therefore, we find that the MSPB did not err as to the second Carr factor.

### 3. Third Carr Factor

As to the third factor, the MSPB noted that there were no similarly situated employees to use as comparators, so "this factor is not a significant one." I Joint App. 284; see Rickel v. Dep't of the Navy, 31 F.4th 1358, 1364–65 (Fed. Cir. 2022).

Mr. Frericks argues that the MSPB erred by failing to compare his treatment with that of others involved in the 2019 incidents, namely Mr. Roman-Sanchez, Mr. Lopez, and Mr. Hull. Aplt. Br. at 76. But whether another employee is a proper comparator depends on whether the "conduct and the circumstances surrounding the conduct of the comparison employee are similar to those of the disciplined individual." Rickel, 31 F.4th at 1365 (emphasis omitted) (quoting Carr, 185 F.3d at 1326–27).

The Board found that there was no similarly situated employee, basing that determination on Ms. Vehslage's testimony that she was not aware of "any other instances of the same kinds of behavior at the level or at the repetition in our department." I Joint App. 21; II Joint App. 19. As before, the AJ found Ms.

27

Vehslage's testimony credible, and we will not disturb that finding. I Joint App. 209; Lockheed Martin Corp., 717 F.3d at 1129; Baca, 983 F.3d at 1140. It would therefore be improper to use Mr. Roman-Sanchez, Mr. Lopez, or Mr. Hull as comparators because no such employee's conduct was comparable to that of Mr. Frericks. Because "the absence of any evidence relating to Carr factor three can effectively remove that factor from the analysis[,]" the Board did not err in finding this factor to be insignificant. Whitmore, 680 F.3d at 1374.

Accordingly, substantial evidence supports the MSPB's determination that the Navy proved by clear and convincing evidence that it would have terminated Mr. Frericks in the absence of his protected disclosures.[4]

---

[4] For this reason, we do not address Mr. Frericks's argument that the Board failed to "consider the record as a whole" when it assessed the contributing factor element for each protected disclosure individually. Aplt. Br. at 42–47. However, we note three reasons why this argument would be unavailing. First, Mr. Frericks relies on a Fourth Circuit decision that assessed whether an employee's activity constituted protected oppositional conduct under Title VII's anti-retaliation provision, 42 U.S.C. § 2000–3(a), rather than whether an employee's protected disclosure was a contributing factor to his removal under the WPA. Aplt. Br. at 42; DeMasters v. Carilion Clinic, 796 F.3d 409, 417 (4th Cir. 2015). Second, Mr. Frericks points to the APA's general requirements for statutory review, 5 U.S.C. § 706, but this is insufficient because the language of the WPA supports the individualistic approach that the Board employed. Aplt. Br. at 42–43; Reply Br. at 9–10. The relevant statute states that the Board must determine whether the employee's protected disclosure was "a contributing factor in the personnel action," suggesting that the Board can consider each disclosure individually rather than requiring the Board to consult the totality of the employee's protected activity in making this determination. 5 U.S.C. § 1221(e)(1) (emphasis added); see also English v. Merit Sys. Prot. Bd., 23-9526, 2023 WL 8851292, at *4 (10th Cir. Dec. 21, 2023) (affirming Board's determination that protected disclosures were not a contributing factor to personnel decision). Third, as we have explained here, the Board did consider the record as a whole when assessing the contributing factor element and found that the Navy relied upon the 2019 incidents and not upon Mr. Frericks's prior conduct.

**AFFIRMED**.

Entered for the Court


Paul J. Kelly, Jr.
Circuit Judge